AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| Information associated with Facebook account ) | |
| 100067031421745 that is stored at premises ) | Case No.   2:24-sw-0244 CKD |
| owned, maintained, controlled, or operated by ) | |
| Meta, Inc. ) | |

**FILED**

**Mar 8, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-2, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 247(a)(2) | Obstruction of persons in the free exercise of religious beliefs |
| 18 USC § 1038 | Hoaxes |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Jerid Hensley, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to and signed telephonically, consistent with Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure.

Date:  March 8, 2024 at 11:44 am

*Judge's signature*

City and state:  Sacramento, California

CAROLYN K. DELANEY, U.S. Magistrate Judge
*Printed name and title*

I, Jerid Hensley, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## I.        INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed with the FBI since December 2020. I graduated from the Basic Field Training Course at the FBI Academy in Quantico, VA in April 2021. As part of this training, I gained criminal investigation training that included course studies in criminal law and search and seizures. Upon graduation, I reported to my assigned field office in San Diego, CA. From May 2021 through September 2021, I assisted the Violent Crimes and Violent Street Gang squads with multiple search warrants involving criminal activity, to include drug trafficking and illegal gambling operations. In the process I have gained additional experience and knowledge in investigative procedures and policies covering multiple United States Code violations.  I have reviewed evidence obtained from digital devices.

2.      From May 2021 to September 2023, I was assigned to the Joint Terrorism Task Force ("JTTF") of the FBI, San Diego Division.  Since September 2023, I have been assigned to the JTTF of the FBI, Sacramento Division.  During my tenure with the JTTF, I have conducted investigations of individuals suspected of engaging in, or supporting, terrorist organizations and acts of terrorism. These counterterrorism investigations often involve the investigation of other violations of federal laws, such as immigration fraud. I have received specific training in counterterrorism investigations and the methods used by international terrorist organizations to further their unlawful goals. I have also gained knowledge of the various communications methods utilized by international terrorist organizations, including social media applications such as Facebook. From November 2016 to November 2020, I was the Senior Terrorism Intelligence Analyst and Supervisor for the California State Threat Assessment Center's Strategic Intelligence Team, where I specialized in conducting research and analysis on foreign terrorist organizations who pose a threat to U.S. interests abroad, and more specifically those who pose a threat to the Homeland. In that capacity, I received advanced training and gained additional subject matter expertise in extremist ideologies and terrorist tactics, techniques, and procedures.

3.      Based on my training and experience, I know that many extremist groups in the Middle East, and their affiliates, and those who are indirectly inspired by these groups, utilize social media platforms and private social media messengers to include, but not limited to, X, formerly known as Twitter, direct messenger, Facebook, Facebook messenger, WhatsApp, and Discord to communicate and provide material support to these groups. I am also aware that these individuals use YouTube to gather and disseminate information regarding acts of terror and the activity of terrorists, including designated Foreign Terrorist Organizations.

4.      I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request issuance of federal search and seizure warrants. I have participated in search warrants and arrest warrants for violations under Title 18 of the United States Code.

## II.    PURPOSE OF THE AFFIDAVIT

5.      The FBI is investigating Zimnako SALAH (hereinafter "SALAH") for possible violations of federal law including Title 18, United States Code, Section 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs), and Title 18, United States Code, Section 1038 (Hoaxes). I make this affidavit in support of an application for a warrant to search for evidence relating to these offenses in the following locations:

a.   **YouTube Account:** Collections of data and information (accounts) associated with YouTube channel URL youtube.com/channel/@zimnako1979 associated with display name "Mike AZ" and Google ID 65304195696 (the "**YouTube Account**," Attachment A-1) that is stored at premises owned, maintained, controlled, or operated by Google LLC, an email provider headquartered in Mountain View, California. Google LLC is an electronic communications service and/or remote computing service. The information to be searched is described in the following paragraphs and in Attachment A-1, attached hereto and incorporated by reference herein.  The items to be seized are described in the following paragraphs and in Attachment B-1, attached hereto and incorporated by reference herein.  This affidavit is made in support of an

2

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google LLC ("Google") to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID identified in attachment A-1.

b. **Facebook Account:** Collections of data and information (accounts) associated with Facebook user identification 100067031421745 (the "**Facebook Account,**" Attachment A-2) that are stored at premises owned, maintained, controlled, and operated by Meta Platforms, Inc., a social networking company headquartered in Menlo Park, California.  Meta Platforms, Inc. is an electronic communications service and/or remote computing service.  The information to be searched is described in the following paragraphs and in Attachment A-2, attached hereto and incorporated by reference herein.  The items to be seized are described in the following paragraphs and in Attachment B-2, attached hereto and incorporated by reference herein.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platforms, Inc. ("Meta") to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID identified in Attachment A-2.

c. **Apple Account:** Collections of data and information associated with Apple identification numbers Apple DSID 1522632377,[1] which is associated with email address zimnako1979@gmail.com ("**Apple Account 1**," Attachment A-3) and Apple DSID 20604610404, which is associated with email address kotreafry@icloud.com ("**Apple Account 2**," Attachment A-3), that are stored at premises owned, maintained, controlled, and operated by Apple, Inc. ("Apple"), a multinational technology company headquartered in Cupertino, California.  Apple is an electronic communications service and/or remote computing service.

---

[1] A DSID is a Directory Services Identifier which is a method of identifying AppleID accounts. It is equivalent to a serial number for a device, however, it is assigned by Apple to an AppleID or iCloud account for use in identifying cases in iLog, the iCloud support tool, or for verifying a customer over the line. Every account has an assigned DSID, and provided the customer can verify themselves as the account holder, is available for customer reference.

3

The information to be searched is described in the following paragraphs and in Attachment A-3, attached hereto and incorporated by reference herein.  The items to be seized are described in the following paragraphs and in Attachment B-3, attached hereto and incorporated by reference herein.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Apple ID identified in Attachment A-3.

### III.     JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### IV.     SUBJECT ZIMNAKO SALAH

7.     As confirmed by photo identification and United States Immigration and Customs Enforcement (ICE) records, SALAH is a 44-year-old male who currently resides in Phoenix, Arizona. SALAH was born in Iraq and entered the United States on March 28, 1999, through New York City. SALAH is a naturalized United States Citizen.

### V.     LEGAL BACKGROUND

8.     This investigation concerns alleged violations of the following:

a.     Title 18, United States Code, section 247(a)(2) provides, "(a) Whoever, in any of the circumstances referred to in subsection (b) of this section-- … (2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so … shall be punished as provided in subsection (d)."  Section (b) provides, "The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce."

b.     Title 18, United States Code, section 1038(a)(1) provides, "…Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such

4

information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—(A) be fined under this title or imprisoned not more than 5 years, or both …"

       c.     Chapter 40 of Title 18 contains 18 U.S.C. § 844(i), which states, "(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

## VI.     PROBABLE CAUSE

### A.   Basis for Facts Set Forth in this Affidavit

      9.     I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation.  Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

      a.     Oral and written reports to include analysis about this investigation as well as related local investigations, which I have received from other law enforcement agencies;

      b.     Review of online account information;

      c.     Subject interviews;

5

d.      Witness interviews;

e.      Law enforcement and public databases and records;

f.      Review of security camera footage;

g.      Review of subject's cellular telephone; and

h.      Review of items observed/seized.

10.      Unless otherwise noted, when I assert that a statement was made, I have personal knowledge of the information or I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report.  The officer had personal knowledge of the information or received it from another law enforcement officer or a witness with personal knowledge of the information.

### B.      Brief Overview of Evidence

11.      There is probable cause to believe that on Sunday, November 12, 2023, SALAH committed a bomb hoax at a church located in the Eastern District of California.  SALAH is an Arizona resident.  Between September 24, 2023, and his arrest in San Diego County on November 28, 2023, SALAH visited at least four churches, one in Arizona, two in California, and one in Colorado.  During each of the trips, SALAH visited only briefly and did not attend church services.  Each time, SALAH carried a backpack.  At two of the four churches, he placed a backpack in the church and immediately left.  Specifically, at the Arizona church, he left the backpack in the sanctuary.  In one of the California churches—the church located in the Eastern District of California—he tied the backpack to the toilet in the men's restroom.  Church employees at both churches treated the backpacks as potentially containing a bomb.  As a result of the Eastern District of California bomb hoax, the church has increased security and incurred substantial additional security costs.

12.      During his travels around the western United States, SALAH frequently changed license plates on his vehicle in what appears to be an attempt to avoid detection by law enforcement.  On November 25 and again on November 28, SALAH was arrested with a loaded firearm under the driver's seat of his vehicle.  Additionally, prior to visiting the Colorado church, SALAH rented a storage unit located approximately fifteen minutes from that church.  SALAH stayed overnight in the unit and stored

component parts for a destructive device or a hoax device, such as a propane cannister with wires taped to it, and strips of duct tape lined with nails.  As pictured and discussed in detail below, an antisemitic statement was scrawled on the wall of the storage unit in Kurdish along with a reference to the Prophet Muhammad.

**C.      SALAH Travels from Arizona and Ties a Backpack to a Toilet in a Roseville, California Church**

13.      Based on information from a law enforcement database, a green/yellow 2008 Toyota Prius ("Prius") registered to ZIMNAKO SALAH ("SALAH") was in the parking lot of a Christian church located in Roseville, California at approximately 8:32 a.m. on November 11, 2023.  According to the law enforcement database, the Prius began to back out of a stall at the church parking lot at approximately 8:49 a.m.

14.      Law enforcement databases also indicate that the Prius traveled in Roseville, California and neighboring Rocklin, California at several times between the hours of 2:23 a.m. and 11:15 a.m. on November 11, 2023.

15.      Based on my review of local police department reports, security camera footage from the aforementioned Christian church located in Roseville, California, and information provided by one of the members of the church and church staff, I know that on November 12, 2023, at approximately 9:40 a.m., an individual later identified as SALAH approached a side entrance of the church, poked his head through the door, and then entered the church from that side entrance with a backpack.  Once inside, he looked behind himself and then walked directly to the men's bathroom.  He was in the bathroom for approximately 35-40 seconds and exited the bathroom without the backpack.  He immediately left the church through the same side entrance.  At one point as he was leaving the church, he jogged.  SALAH arrived during the 9:00 a.m. service, so there were no witnesses to his activity in the lobby.  He was, however, captured on the church's security footage.  He was wearing a hat while in the church.  The church did not have security cameras in its parking lot, so no additional footage was captured of SALAH in the church parking lot.  The local police department obtained footage at a nearby intersection of the Prius with an Arizona license plate registered to SALAH at approximately 9:36 a.m., 9:45 a.m., 9:48

a.m., and 9:49 a.m. on November 12, 2023, which is immediately before and shortly after the incident at the church in Roseville.

16.     According to church members and church staff, when church staff became aware of the backpack, they photographed it and called the local police department.  Police officers arrived at approximately 1:20 p.m.  In the interim, a church staff member removed the backpack, opened it, and located a pillow inside.

17.     The photograph that the church staff took is below.  As the photograph depicts, it was tied to the toilet.



18.     Still images from the church security footage are below:

8











1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22    19.    Based on my review of a driver's license photo and passport application containing

23  SALAH's photo, the person in the photos above appears to be SALAH.

24    20.    A police officer familiar with SALAH's appearance and actions on November 12, 2023,

25  returned to the church to view additional footage on November 27, 2023.  Upon his review, he noted

26  that SALAH had also entered and left the church on November 12, 2023, prior to placing the backpack

27  in the bathroom.  Specifically, the officer observed:

28

a.  SALAH entered the church at 09:23:44 PST on the opposite side of where he later entered, same clothes but no backpack.

b.  SALAH entered the sanctuary at 09:23:53 PST.

c.  SALAH exited the sanctuary on the opposite side at 09:26:04 PST.

d.  SALAH walks straight to the same bathroom in which he later left the backpack, and he entered that bathroom at 09:26:15 PST.

e.  SALAH exits the bathroom at 09:27:31 PST.

f.  SALAH exited the church at 09:27:51 PST using the same exit he used after he planted the backpack and walked away from the church in the same direction.

21.     Below are screenshots from the abovementioned footage:







14







1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



22.     Based on my training, experience, and knowledge of this investigation, I believe that SALAH tied the backpack to the toilet in the church on November 12, 2023, in an attempt to indicate that a bomb had been left in the restroom.  I believe that the presence of SALAH's Prius in the church parking lot on November 11, 2023 (the morning before he left the backpack) and in the church at 9:23 a.m. (less than 20 minutes before he left the backpack) indicates that SALAH was surveilling the church in an effort to facilitate his placement of the backpack in the church.

23.     Upon receiving this information, the FBI reviewed a law enforcement database that indicated that the Prius was in Phoenix, Arizona, on October 30, 2023, in Lakeside, California, on November 1, 2023, in Carlsbad, California, on November 5, in Sacramento, California, from November 5 to November 9, in the Bay Area (Hercules, Pinole, and Sausalito) from November 9 to November 10, and in Roseville and Rocklin, California, from November 11 to November 12.

24.     As noted above, information obtained from a law enforcement database showed that the Prius was in Roseville, California, shortly before and after SALAH was at the Roseville church.  This database information also showed that the Prius was in Phoenix, Arizona the next day, November 13, 2023.

25.     On January 24, 2024, your affiant interviewed an employee of the Roseville church ("Church Employee 1"). During the interview, Church Employee 1 provided the following information:

a.   Church Employee 1 has been employed at the church for nine years and in Christian ministry for 20 years. The November 12, 2023 incident where someone left a suspicious backpack tied to a men's restroom toilet at the church's Roseville campus was the strangest security incident he has witnessed.

b.   On November 12, 2023, while coming out of the 9:00 AM church service at the Roseville church, Church Employee 1 made his way from backstage to the church's front lobby, when church security notified him of a suspicious backpack in a men's restroom. Church Employee 1 stated that the church's security team is mostly made up of active and/or retired law enforcement officers.

18

c. Once Church Employee 1 and church security who were involved saw that the backpack was tied/strapped to the pipes of the toilet in the men's stall, they determined that they needed to call 911. One individual called 911, and another individual (Church Volunteer) began creating a barrier/perimeter around the restroom, which required her to move high school church congregants who had an area near the restroom where they normally gathered. Church Employee 1 stated that he felt "tight in the chest" recalling the incident.

d. They began to evacuate special needs students out of a classroom located next to the men's restroom with the suspicious backpack. Other church greeters were placed at entrances/exits to block doors and redirect church foot traffic. Security began to move mobile six-foot by five-foot wood walls with wheels to help create a barrier/perimeter around the restroom and to direct the flow of foot traffic. Church Employee 1 and security began to tell people in the vicinity of the men's restroom asking questions that there was a security issue.

e. There had been a large youth campout at the church building the previous day, so Church Employee 1 and some of the security staff had initially thought maybe one of the kids at the campout left a backpack in the restroom. Church Employee 1 then went back out to the restroom area and found that a fairly large perimeter had been established around the restroom. However, Church Employee 1 and the security staff agreed it was not just a bag left in the restroom by a youth member the day before, and that it was actually strapped to the toilet pipes, which was very suspicious and concerning.

f. At that point, another church employee in a separate building across from one of the main church doors, which was the closest door to the men's restroom with the suspicious backpack, began preparing staff and children to be evacuated from the children's building. They still had not heard from the local police department or seen them respond after originally calling 911 upon the discovery of the suspicious backpack. They called 911 again to ask if they should evacuate the church and surrounding church buildings. The 911 dispatcher told them that they were dealing with multiple calls, and that the church's call would be handled in the order it was received.

19

g. Church Employee 1 stated that he then made the ill-advised decision to attempt to figure out what was in the suspicious backpack. Church Employee 1 and Church Volunteer found a first aid person, gathered in the church food preparation area, said a prayer, put gloves on, and Church Volunteer took the lead and they slowly made their way to the restroom and the suspicious backpack. Church Volunteer unstrapped the backpack from the toilet pipes and moved it outside and away from the main church building. Church Volunteer discovered a pillow inside of the backpack. Church Volunteer took the pillow and backpack and placed them in a church dumpster. They called 911 a third time and explained that a pillow had been found inside the backpack and that the situation was mitigated.

h. After the security camera footage was viewed by Church Employee 1 and other church staff/security members, it became clear that the individual who left the backpack in the church restroom was not known to attend the church. Church Employee 1 stated that it was "chilling" to watch security camera footage of the suspicious individual. Church Employee 1 later heard that a similar incident had happened at a different church, which made Church Employee 1 think that the Roseville church was targeted by the individual who left the backpack.

i. Church Employee 1 recalled that when he first heard about the suspicious backpack, he thought it could have been left in the restroom by one of the youth members who participated in the campout the day before. However, when they saw that the backpack was tied/strapped to the toilet, Church Employee 1 thought there was possibly a bomb in the backpack. Church Employee 1 stated that the backpack was left at the most strategic time, between two services, when there is the most foot traffic at the church.

j. Church Employee 1 stated that he and Church Volunteer were scared to deal with the backpack and said a prayer before going into the restroom.

k. The special needs classroom next to the restroom with the suspicious backpack was closed just before the second church service started due to the incident. Church staff/security had to turn families away who went to drop off their special needs children at the classroom, likely forcing parents to also miss their adult service in the main sanctuary.

20

l.   The perimeter around the restroom was pushed out into the main church lobby, forcing normal foot traffic to shift, and also forced the church to close its cafe in/near the lobby, which is where they sell coffee, snacks, and other items. The cafe remained close throughout the entire second church service.

26.   On January 24, 2024, your affiant interviewed a member of the security team for the Roseville church, hereinafter referred to as "Church Volunteer" During the interview, Church Volunteer provided the following information:

a.   During a church service at the Roseville church on November 12, 2023, Church Volunteer heard a call over the church security radio that something was found in the men's restroom. Church Employee told Church Volunteer that a church member told him about the backpack found in the men's restroom stall. Church Volunteer witnessed the backpack herself, and it was strapped to the toilet. She began creating a safety perimeter around the restroom. Church Employee 1 had just taken bomb training as part of his employment with Sacramento County, so Church Volunteer felt comfortable with his help.

b.   They started making a larger perimeter while they waited for the local police department to respond to the church.

c.   Church Volunteer recalled praying, putting gloves on, and going to the restroom with Church Employee 1 to inspect the backpack. Church Volunteer recalled thinking she "might meet Jesus today" before handling the backpack. Church Volunteer took the backpack outside, where she carefully opened it and saw a pillow inside.

d.   Church Volunteer 's first concern when seeing the backpack was that it was an explosive device, and based on her training and experience, she began to think about other secondary devices. Church Volunteer was especially concerned about the children in the church.

e.   Church security had to move/displace high school congregants who typically gather in the area near the restroom.

f.   The church's cafe had to shut down because the safety perimeter pushed into the main lobby, which disturbed the movements of hundreds of congregants.

21

g.  Church Volunteer stated that she made a mistake handling the suspicious backpack. The backpack was tied to the toilet in a way that was intended to look like a bomb, based on her training and experience. Church Volunteer is a retired Sheriff's Deputy who was on duty from 1999-2014. Church Volunteer recalled throwing the backpack away in the dumpster because she was told that the local police department was not coming to the church.

h.  Church Volunteer stated that the subject who left the backpack seemed to have been on the campus before based on his movements, and that he planned to leave the backpack during a time when people were in service so he might go unnoticed. The subject's movements looked very intentional, based on Church Volunteer 's review of the security camera footage. The incident personally impacted Church Volunteer, and she is more aware that the church could be a target. Church Volunteer realized that there are people out there who might want to hurt their people. The entire incident has forced the church to change their protocols, and it has shook up church staff and volunteers.

27.     On January 24, 2024, your affiant interviewed another employee of the Roseville church, hereinafter referred to as "Church Employee 2" During the interview, Church Employee 2 provided the following information:

a.  On November 12, 2023, during the middle of 9:00 a.m. service, it was relayed over radio communication utilized by the security team, and other leaders from the church that a backpack was left in the men's restroom. That particular weekend, the church hosted a campout for middle-school-aged children. This led staff to initially think one of the children accidently left a backpack behind. It was further discovered and relayed to church security that the backpack was tied to a toilet. Security and staff personnel no longer believed it was left by one of the youth who attended the campout.

b.  Church security began to block off the front entrance to the restroom utilizing a wooden partition on wheels. As time went on, security decided to establish a larger perimeter away from the restroom. They moved the partition back to door two, located near the main entrance, which is

22

door three. This made door two the main point of entry into the church. Door five, the closest

door to the men's restroom with the suspicious backpack was also blocked off.

    c.   Once Church Employee 2 watched the security camera footage, she became much more

concerned. Church Employee 2 stated that she thought the incident could have been a dry run or

test run by the individual who left the backpack.

    28.    On January 24, 2024, your affiant interviewed a Roseville church employee familiar with

the church's finances ("Church Employee 3").  Church Employee 3 explained how the church

significantly modified and increased its security measures following the incident with the backpack on

November 12, 2023.  Church Employee 3 also noted that the church spent thousands of dollars on this

additional security.

### D.    SALAH Travels Directly from Phoenix, Arizona to a Church in the Denver, Colorado Area Where He Again Brings a Backpack But is Encountered by Security

    29.    On November 17, 2023, the FBI received information from a law enforcement database

indicating that the Prius was in Highlands Ranch, Colorado on November 15, 2023.[2]  On November 20,

2023, an agent from the FBI Sacramento office contacted the FBI Denver office to notify them of

SALAH's presence in Colorado and of the situation with SALAH at the church in Roseville.  FBI

Denver advised FBI Sacramento that they had just received a report of suspicious activity from the

Arapahoe County Sheriff's Department regarding a Middle Eastern man at a local church on November

19, 2023 – exactly one week after the incident at the church in Roseville. The report was written by

Officer Kevin Heaton and contained the following information:

    a.   "On November 19, 2023, at approximately 10:30 hrs. I was working extra duty at

[the Greenwood Village, Colorado church] when advised of a suspicious male that

had just walked out of the church wearing a red hat. As I walked toward the circle

drive, I noticed a male wearing a red hat retrieving a black back pack from a light

green Toyota Prius parked in the visitor area. The male put the back pack on his

---

[2] Law enforcement database information provided by FBI Dallas on December 13, 2023 indicated that the Prius having license plate DSA8PD was in Thornton, Colorado on November 18, 2023.

back and began to walk toward the main entrance. I greeted the subject, who did not initially appear concerned with my presence. He is described as: Middle Eastern Male, 5'7 - 5'9, medium build, dark colored beard Wearing black jacket, dark jeans, red hat with white circular logo, black back pack."

b.   "As we returned to the main entrance the subject turned left and walked toward the bathrooms and choir area. As I approached the same area the subject came back around the corner and exited through the main entrance. I continued to monitor the subject who returned to his car and drove out of the parking lot westbound on [street]. I could not read license plate number which appeared to be from another state."

c.   "Once I realized the subject had left, I notified the Director of Facilities, […], and recommended we check the bathrooms and areas the subject had walked toward prior to leaving. Nothing suspicious was found."

30.   Officer Heaton reviewed the church security cameras and noted the following:

a.   10:21 - Green Prius enters parking lot […] and drives through circle drive before parking in visitor area. (While viewing camera, image skips and can't read license plate. Unknown if it would skip when video is downloaded.)

b.   10:23:17 - Subject enters main entrance and walks into sanctuary. Subject appears to walkthrough sanctuary and out north entrance back into the lobby. Subject walks around lobby and back into the north sanctuary area before leaving.

c.   10:28:01 - Exits through main entrance toward parking lot.

d.   10:31:56 - Walks back into church and goes left toward restrooms, choir area

e.   10:32:50 - Leaves church with back pack.

f.   10:34:20 Leaves parking lot

31.   Officer Heaton's report also stated that he took a picture with a cellphone of the church footage showing the subject's vehicle. That photo is below.  The officer could not read the license plate on the Prius but believed that it was from out of state:

24



32.   Officer Heaton's report also stated that his body-worn camera showed subject wearing the backpack being greeted by him at 10:39 a.m.  A still shot from that camera footage is below.



33.     Based on my review of a driver's license photo and passport application containing SALAH's photo, the person in the body-worn camera still photo above is SALAH.

34.     Law enforcement database information showed that the Prius bearing license plate DSA8PD was located in Phoenix, Arizona the next day, November 20, 2023.

**E.      Summary of Witness Interviews, Which Indicate that SALAH Carries a Firearm, Has Expressed Anti-American Sentiment, and has Exhibited Behavior that Concerned his Neighbors**

35.     In an attempt to locate SALAH, agents from FBI, Phoenix visited his last known address in Glendale, Arizona, on November 17, 2023.  There, they encountered the new owners of that residence, L.S. and A.R., who indicated that they purchased the property in August 2023. L.S. and A.R. provided the following information:

a.   L.S. and A.R. recently moved into their home approximately August or September 2023. During the transition of the move, they had more than one interaction with the previous tenant, SALAH. L.S. and A.R. had to interact with SALAH while he retrieved his remaining items from the house so that they could paint the home. During one interaction, L.S. stated that SALAH would only talk to A.R. and would turn his back to L.S. Their realtor told L.S. that SALAH was a good guy and only behaved that way because of his religion. A.R. was wearing a hat with an American flag on it. SALAH commented on the hat and said that the USA was bad. A.R. challenged SALAH on this comment and told SALAH that you live in this country; why do you hate it? SALAH responded and said, "Fuck this country," and this country went over and killed many Iraqis.

b.   On another day, SALAH was at the house getting items from the home while they were there. SALAH saw a cop car turn down the road near the home, and SALAH freaked out and ran inside until the cop car was out of sight.

c.   During their interaction with SALAH, SALAH carried a gun in the small of his back. They also found ammunition in one of the rooms as they moved their items into the home. The round was believed to be a 9mm.

26

d. SALAH still had one vehicle that belonged to him at the home. A.R. texted SALAH in September to retrieve the car. The number A.R. had for SALAH was 480-522-0691. The last message A.R. sent to SALAH was on October 1, 2023. A.R. asked SALAH if he could retrieve the car. SALAH had not responded to that text message.

36.     On November 18, 2023, your affiant contacted L.S. via telephone who provided the following information:

a. L.S. and A.R. bought the aforementioned residence in August 2023, from whom they believed was SALAH's mother.  They moved into the residence in September 2023.  They heard that SALAH's mother had moved back to Iraq where they were from.  L.S.'s neighbor told her that they never saw SALAH's mother at the residence, and that SALAH was the only one they saw living there.  L.S. stated that they originally made an offer on the home back in June or July 2023, but it was declined by the owner.  They heard from the real estate agent that the owner wanted to sell it to a family with kids.  L.S. and her husband put in another offer in July, and the owner took $5,000 off the price and accepted the offer.

b. SALAH had his things in storage at the residence, along with two vehicles. After L.S and A.R. moved in, SALAH still had not moved his stuff out of storage and left the two vehicles. When they contacted SALAH to request that he move his stuff out, he showed up at the residence and was really mad.  SALAH said he was mad because they took $5,000 off the price of the home and he thought he could just keep his stuff there because he had nowhere to put it.  During the conversation, SALAH turned his back to L.S. and would not address her because SALAH said she was a woman and it was forbidden in Islam. Around the same time, SALAH saw that A.R. was wearing a hat with an American flag on it.  SALAH asked A.R. if he liked the flag on his hat, which A.R. said he did because it's his country.  SALAH then said, "Fuck this country.  I hate America. This country went to Iraq and killed a lot of people."  A.R. tried to calm him down.  Three days later, SALAH showed up again at the residence and said sorry about his behavior on his previous visit.  At the same time he moved his body so that L.S. and A.R. could

27

see that he had a handgun tucked into his pants at the small of his back.  L.S. believed he was trying to intimidate them.  SALAH took one car but left one at the residence.

c. The last time they saw SALAH at the residence, A.R. was washing one of his own vehicles. SALAH expressed interest in buying the car and A.R. let him drive it down the street a few blocks.  SALAH came rushing back to the house, jumped out of the car, and ran into the house. When they asked what he was doing, SALAH stated that he saw a police car and it was following him.  The car that A.R. let SALAH drive did not have plates, but A.R. thought SALAH was acting very strange.  L.S. and A.R. found pistol ammunition in SALAH's old storage space at the residence, along with a pistol bullet in the clothing drying machine that came with the house.  One neighbor across the street told L.S. that they were all scared of SALAH because they had seen him with a gun before.  They also said that SALAH fought with neighbors because he hated their cats and dogs because of his religious beliefs.

d. L.S. did not know if SALAH had a job or where he might be currently.  The last time they saw him was around August 2023.  The last time they talked to him was in late September, and he is not responding to their texts or calls.  The community Home Owners Association management knows SALAH, and they seemed to think that he was a nice guy.  L.S. thought he might have lived there for around 15 years.  L.S. did not think SALAH had any serious mental health issues but that something seemed wrong with him because of his statements and behavior.  The house was also filled with mirrors, which she thought was part of his religious beliefs.  The second vehicle that SALAH left at the residence is a 1998 Toyota car.  Paperwork in the vehicle showed it was under the name of Matthews W. Wolford, 18621 North 44th Pl., Phoenix, AZ 85024.

37.     On November 19, 2023, your affiant interviewed an individual via telephone who has been the HOA security and maintenance person for the community in which SALAH resided for many years in Glendale, Arizona.  This individual, hereinafter referred to as "C.A.," provided the following information about SALAH:

a. C.A. stated that he has interacted with SALAH many times over the years.  C.A. said that SALAH has a real temper and did not like to follow HOA rules.  SALAH had a U-haul box truck

28

for quite some time that he parked in the community RV storage lot.[3]  It was a class B RV that is still parked in the aforementioned storage lot. SALAH told C.A. that he stored his tools in the U-Haul truck, but C.A. never actually saw what was in the truck.  C.A. stated that SALAH had three to six vehicles at the storage lot where he would do work on the cars, which was not allowed per the HOA rules.  SALAH would get upset with C.A. when he was confronted about having to move the cars off the storage lot.  C.A. stated that SALAH bought and sold cars, and that he might have worked at a repair shop in the past.

b. SALAH mentioned that he had an uncle and/or connections in California.  SALAH told C.A. that he had been in the US Army as an interpreter.  SALAH also told C.A. that he carried a gun.  He told one of C.A.'s friends not long ago that America gets what it deserves, like the COVID-19 pandemic, and that there would be more to come.  C.A. stated that SALAH went underground for a while last year and would never come out of his house. SALAH's mother used to walk around the neighborhood, but she went back to the Middle East for Ramadan.  It has been a few months since C.A. has seen SALAH.  One night one of SALAH's next-door neighbors noticed smoke outside, and when they looked to see where it was coming from, they saw SALAH burning papers on his side lawn.  When the neighbors asked SALAH if everything was all right, SALAH told them to "mind their own fucking business."  Around the same time, he was seen burning papers, the neighbors also saw him paint one side of his vehicle and then remove the paint not long after.

c. C.A. was not aware of SALAH having any siblings/family other than his mom, but he remembered SALAH mentioning that "his brothers" were upset with him when in the past one of his mother's mobile homes burned down. SALAH had made comments about being upset that his mother did not give him any money after selling the house in Glendale, AZ.  SALAH is known as a loner, and the last time C.A. was in contact with SALAH was September 21, 2023, using telephone number 480-522-0691.

---

[3] This is a separate storage lot located in Glendale, Arizona, which is different from the storage unit in Colorado mentioned below.

38.     On November 19, 2023, your affiant interviewed one of SALAH's neighbors, hereinafter referred to as "T.D.," via telephone.  T.D. provided the following information to law enforcement:

a.  T.D. has lived in his current residence, about five houses away from SALAH, for ten years. SALAH went into hiding for about a year after SALAH's mother put the house up for sale in 2022. SALAH had been living in his mother's home for years.  T.D. stated that SALAH just stopped coming out of the house.  SALAH told T.D. that America deserved the COVID-19 pandemic.  T.D. told SALAH he better watch what he said.

b.  SALAH's next-door neighbors told T.D. that when SALAH came out of hiding in his house, he started burning papers outside his house at an odd hour at night.  SALAH told the neighbors to mind their own business when they asked SALAH if everything was ok.

c.  T.D. and other neighbors consider SALAH to be a sketchy, weird guy.  SALAH recently tried to give T.D. a pair of dress shoes for no apparent reason.  T.D. recently got a new pair of boots in the mail from an unknown sender.  T.D. stated that they could be from SALAH, but he does not know why he is trying to give him shoes.  T.D. stated that at one point he heard that SALAH had barricaded himself in his parked RV in the community RV storage lot, and that Glendale Police Department (PD) might have been involved in the incident.  Glendale PD knows of SALAH because SALAH had called them a lot to make complaints in the past.

d.  SALAH's next-door neighbor is Willie.  Willie is the neighbor who witnessed SALAH burning papers in his lawn at night.  T.D. also noticed around the same time SALAH was seen burning papers, that he randomly started painting one side of one of his vehicles, then he promptly removed the paint.  SALAH drives a green/yellow Toyota Prius, but the last time T.D. saw SALAH, he was driving a motorcycle wearing a black leather jacket and helmet.[4]  SALAH had

---

[4] As discussed below, two motorcycles were observed by the FBI to be inside SALAH's residence on November 21, 2023. In addition, as discussed more fully below, on December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized a search of SALAH's residence located in Phoenix, Arizona. On December 12, 2023, your affiant witnessed two motorcycles in the residence and one motorcycle in the garage of the residence.

recently complained to T.D. that his mother did not give him any money from the sale of her house that SALAH had also occupied.

39.     According to a law enforcement database query, SALAH has a permit to carry a concealed weapon in Arizona.

40.     On December 8, 2023, your affiant conducted a follow-up interview with C.A. During the interview, C.A. provided the following information about SALAH:

a.   C.A. tried to avoid SALAH in the past because SALAH always flipped conversations and would get negative. Approximately five years ago, C.A. saw SALAH in a Home Depot check-out line. SALAH and C.A. talked for approximately 30-40 minutes after checking out of the store. During the conversation, SALAH stated that he was a Christian Muslim/Muslim Christian. C.A. did not know what he meant. SALAH flipped the conversation and began to say bad/negative things about Christianity and stated that Islam was the correct religion. C.A. did not know why SALAH was talking to him about those issues.

b.   Anytime SALAH saw C.A. in their neighborhood or in town, SALAH would talk to C.A. about Islam and he would put down Christianity. C.A. stated that SALAH was known as a loner, and C.A. recently heard one neighbor talk about SALAH possibly being [a member of] a sleeper cell because of his suspicious nature. C.A. thought that SALAH had travelled to Turkey at one point to find a wife, but C.A. did not think SALAH found one before returning to the United States.

c.   C.A. remembered that when SALAH and his mother moved into their community about ten years ago, SALAH's mother went on walks around the neighborhood wearing a hijab, and she would randomly tell people that they were Christian.  C.A. stated that it was strange she would randomly tell people that, and that she has traveled to the Middle East in the past to celebrate Ramadan. C.A. stated that SALAH's mother might have told people they were Christian to fit it to the community after arriving to the United States from Iraq. Neither SALAH nor his mother ever talked about going to Christian churches.

**F.**      **SALAH's Interview on November 21, 2023**

41.      Agents from the FBI field office eventually located SALAH at his current residence in Phoenix, Arizona ("Phoenix residence") on November 21, 2023.  SALAH agreed to speak with the agents and invited them into his residence. The interview was recorded.  I have reviewed that recording and I have reviewed the interviewing agent's report of the interview, which I have summarized below. During the interview, SALAH provided the following information:

a.  SALAH is an Iraqi, Kurdish, Sunni male from Northern Iraq who has been living in Arizona for approximately 20 years.  He was residing at the Phoenix residence with his mother.  SALAH's mother was not present and recently traveled back to Iraq to visit family in Slemani [Sulaymaniyah].  SALAH was unsure whether his mother would return to the United States.

b.  SALAH traveled to San Diego approximately a week prior to look for work.  SALAH applied for work at a body shop to work as a mechanic in El Cajon.  SALAH had also seriously considered moving to San Diego.  SALAH spoke with an individual named Kamil LNU (unknown spelling) at the auto shop in El Cajon.  SALAH did not have any other identifying information for Kamil.  While in El Cajon, SALAH prayed and washed his clothes at a mosque located at Broadway and 2nd street.

c.  Also, while in California, SALAH traveled to Sacramento to look for work.  SALAH was told that Sacramento had a large population of Iraqis, so he traveled there to look for work as a mechanic.  SALAH spoke with an individual named Wassam, LNU (last name unknown) ("Wassam") (unknown spelling) at the auto shop.  SALAH did not have any additional identifying information for Wassam.  SALAH applied for food stamps in both San Diego and Sacramento.  SALAH never received his food stamps.[5]

---

[5] On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius and to affix a tracker. Photographs taken from the search of the Prius revealed an application for CalFRESH and CalWORKS dated November 8, 2023, in SALAH's name. The box asking if SALAH is homeless was checked "Yes". An appointment for an interview to obtain these benefits was set for November 27, 2023 in North Highlands, California.

d.  While in Sacramento, SALAH met an individual named John LNU (John) at a gas station. SALAH and John went to a church together because John told SALAH that the church would have clothes that SALAH could take.  SALAH stated that he was at the church for only two or three minutes.  The church did not have any clothes for SALAH, and John told SALAH to maybe come back another week.  SALAH did not have any additional identifying information for John and never saw John again.

e.  SALAH was questioned by interviewing Agents about a backpack that was left at the church. SALAH went to the church with the backpack and stated that he left with the backpack and did not leave a backpack at the Church.  [Agent note:  At this time, interviewing Agents showed SALAH a photograph of the backpack tied to a toilet at the church in Sacramento.  Additionally, Agents showed SALAH photographs of SALAH walking through the church in Sacramento.] SALAH said the backpack from the photograph was not his backpack and he did not leave a backpack in the bathroom.  SALAH said he carried a blue and black backpack and that he carried the blue backpack while in the church in Sacramento.  SALAH stated that the photograph of him at the church was not him and that interviewing Agents could not be sure that the photo positively identified him.  SALAH stated that he wore the color red every day while in California.

f.  [Agent note: At this time, SALAH consented for Agents to look through the backpacks in the room to see if any of the clothing matched the photo.]  Agents did not find anything suspicious or derogatory inside the home.  Agents did not find any matching clothing from the Sacramento incident.

g.  At the time of the interview, SALAH had a Verizon phone and had the phone for approximately one month.  SALAH stated the phone number was 480-689-3264.  The number, however, was never confirmed because the phone was not active and SALAH stated that he had not paid the bill for the line.

h.  SALAH also traveled to Colorado on November 15, 2023, to look for work.  SALAH spoke with Abu Aya (Abu) (unknown spelling) who was renting a warehouse.  SALAH worked for Abu for

33

two days but never received payment.  SALAH left the warehouse because Abu was cheating customers. SALAH had no additional identifying information for Abu.

i.  SALAH stated he never went to a church in Colorado.  SALAH was shown a photo of himself at the church in Colorado and agreed it was him.  SALAH asked Agents if it was illegal to go to churches.

j.  SALAH was asked if he ever expressed hatred towards the United States or said, "Fuck this Country."  SALAH denied this and said that anybody who knew him knew he had more respect for the United States and that he loved this Country.  SALAH expressed willingness to help and said he would call the police if he ever saw someone acting suspicious or looking to harm anyone.  SALAH was open to be contacted by Agents again.

**G.**     **Evidence Indicates that SALAH Switched License Plates and was Again Traveling**

42.     On November 22, 2023, one day after SALAH's interview with agents from the FBI Phoenix office, information obtained by the FBI from a law enforcement database indicated that, at 9:08 p.m., the license plate that was previously on the Prius was traveling in Glendale, Arizona, but a corresponding photograph showed that the license plate was now on a Toyota Land Cruiser**.**  Later that night, at approximately 10:00 p.m., the FBI obtained information from a law enforcement database indicating that the same license plate was 45 minutes south of Phoenix, Arizona.

43.     Vehicle records indicate that SALAH also has a Toyota Land Cruiser ("Land Cruiser") registered to him with license plate number RKA2DF.  To your affiant's knowledge, this license plate has not been detected by law enforcement since the Prius license plate was detected on the Land Cruiser on November 22, 2023.

44.     On November 24, 2023, agents from the FBI Phoenix office knocked at the door of the Phoenix residence.  No one answered, and the agents saw that there were no vehicles parked at the property.

45.     Based on my training, experience, and knowledge of this investigation, I believe that this evidence indicates that SALAH switched license plates on his vehicles in an attempt to evade law enforcement detection.  I further believe that the information above, including the license plate being

34

detected 45 minutes south of Phoenix and the absence of SALAH and any vehicles at his residence, indicated that he was again traveling at that time.

**H.    SALAH Arrested in Texas and Found to be in Possession of a Loaded Firearm, Stolen License Plates, and Additional Empty Bags**

46.    On November 25, 2023, your affiant received a call from Texas State Trooper Esparza who advised that she had pulled SALAH over on Highway 10 near MP 185 in Davis County, Texas. The following information is based on my conversations with the State Trooper and her subsequent report.[6]

a.    Trooper Esparza originally noticed an SUV following behind her patrol vehicle for approximately 20 minutes seemingly not wanting to pass her.  The SUV pulled into a rest area where it remained for approximately one hour.  Trooper Esparza circled back to obtain the license plate on the vehicle, which was Texas license plate SBM2647.   This license plate was associated with a Silver 2004 Isuzu, but the SUV to which it was affixed was clearly a Land Cruiser.[7]  Once the vehicle was traveling again, at approximately 10:13 a.m., Trooper Esparza initiated a traffic stop.

b.    The driver provided Trooper Esparza with an Arizona driver's license identifying himself as Zimnako SALAH Salah.  Trooper Esparza asked SALAH for his registration and insurance, and he advised that he did not have either.  Trooper Esparza told SALAH that the license plate on his vehicle was not the plate that belonged to his vehicle and asked him where the Texas plate came

---

[6] This information was provided verbally over the telephone as well as in a report sent to your affiant.

[7] On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to obtain and search the two cellular telephones that were found in SALAH's possession upon his arrest by San Diego Police, discussed more fully below. FBI review of one of these devices, SALAH's Apple iPhone 7 Plus, revealed that this device accessed the Wi-Fi in or about the same location as is believed that Texas license plate SBM2647 was last located in Dallas, Texas. Law enforcement database information shows that Texas license plate SBM2647 was located at or around a particular address in Dallas, Texas on or about November 15, 2023. The license plate appeared to be on a silver vehicle that was located in a marked parking space. On November 24, 2023, SALAH's Apple iPhone 7 Plus appeared to have accessed Wi-Fi on the same street as the above-referenced address in Dallas, Texas at approximately 10:37 p.m. CST. Your affiant assesses that SALAH stole the plate from the silver vehicle mentioned above on that street. SALAH also appeared to have deleted this Wi-Fi location data from this device.

from.  SALAH stated that he had to put his SUV in a mechanic's shop due to some issues and that the people there must have put the plate on the SUV.  Trooper Esparza also spoke with SALAH about his travels.  SALAH stated that he went to Dallas to find work, had applied for many different jobs including to work at Sprouts (a grocery store) but did not have any luck getting a job.[8]  Trooper Esparza asked if he knew anyone in the Dallas area, and he stated that he did not.  SALAH stated that he went to pray at the Mosque for only a few days.  SALAH stated that he started his travels to Dallas on Monday of that week but also stated that the current day was Sunday when it was actually Saturday.[9]  Trooper Esparza asked more about the SUV and why it had Texas plates on it and where the Arizona plates were located.  SALAH said that he could not say where the plates were at.

c.  Trooper Esparza asked SALAH for consent to search the Land Cruiser for any contraband inside the vehicle as far as weapons or illegal narcotics.  SALAH stated that Trooper Esparza could look, but he did not want her to touch his things out of respect.  SALAH showed Trooper Esparza a few bags that just had clothes and other bags inside of them. Trooper Esparza then told SALAH that because he was not allowing her to touch the items, she would treat this as him refusing to permit her to search the Land Cruiser and its entire contents.

d.  Trooper Esparza told SALAH that she had a drug detection canine, which she would deploy for a free air sniff.  The narcotics detection canine alerted to an odor of narcotic emitting from the Land Cruiser**.**  Trooper Esparza, Trooper Britt Williams, Trooper Meagan McConnell, and Trooper Terrace Foster assisted in the traffic stop. The Land Cruiser was searched at approximately 11:53 a.m.  They found the following relevant items:

---

[8] FBI review of SALAH's Apple iPhone 7 Plus revealed a cached image accessed on November 24, 2023, of a screen shot of a confirmation of the receipt of a Sprouts Farmer's Market, LLC., Work Opportunity Tax Credit Questionnaire located at tcs.adp.com.

[9] As noted above, law enforcement database information showed that the Prius bearing license plate DSA8PD was located in Phoenix, Arizona on Monday, November 20, 2023, and SALAH was interviewed by FBI agents at the Phoenix residence on Tuesday, therefore, he was not traveling to Dallas on these dates. Law enforcement database information shows that SALAH began travel out of Phoenix, Arizona on Wednesday night, November 22, 2023.

36

- A handgun under the driver's seat floor mat.  The gun was a CZ P-10 C (9x19) semiautomatic pistol, serial #G033124, which was loaded.  SALAH stated that he did not know the gun was in the car and thought he had left it at home.
- A firearm magazine with multiple rounds inside the pistol.
- Six to eight bags, including suitcases, duffle bags, and backpacks that SALAH said he had just bought at yard sales to use for storage.
- Three butane cannisters which appeared to Trooper Esparza not to have been used for travel grills.
- Four gas cans, two of which contained gasoline.
- One license plate numbered AZ 122VHT. The AZ 122VHT license plate was found under the front driver side seat with the loaded firearm.

e.  Trooper Esparza first called your affiant at approximately 12:44 p.m. I provided Trooper Esparza with a quick overview of SALAH's recent suspicious activities reported at a church in Roseville, California and in the Denver, Colorado area, as well as law enforcement database information about SALAH's movement and that SALAH had changed the license plates on the Land Cruiser on November 22, 2023. I asked Trooper Esparza to be on the lookout for any materials in SALAH's vehicle that could be used to make an explosive device, including anything that might be used to make a fake explosive device. Trooper Esparza asked SALAH what he used the gas cans for in his vehicle. SALAH stated that he was not familiar with that part of Texas, and that he was not aware of where gas stations were, so he needed gas in the vehicle.

f.  Trooper Esparza also informed me that SALAH was in possession of four cellular phones. These phones were a Nokia flip phone, a Nokia phone that SALAH said he used only for overseas travel, a white and pink iPhone [Apple iPhone 7 Plus] that SALAH said he only used to connect to Wi-Fi, and a second black/dark gray iPhone [Apple iPhone 8 Plus] that SALAH claimed was his mother's as discussed below.

g.  Trooper Esparza asked SALAH about the cell phones.  SALAH told Trooper Esparza that one of the phones was his mother's.  He agreed to provide consent to search three of the phones but not

37

the phone that he had identified as his mother's.  SALAH claimed that he did not know the password to that phone; however, Trooper Esparza could see several notifications appear on the screen of the phone for various social media sites as she was speaking with SALAH.  SALAH eventually told Trooper Esparza that he used his mother's phone to view YouTube and social media.  SALAH also told Trooper Esparza that the phone number for that phone was 623-305-1336. When Trooper Esparza again asked SALAH about whether he knew the password to the phone he claimed to be his mother's, SALAH said he did not want to discuss the phone any further.  Consequently, Trooper Esparza ceased asking SALAH questions about that phone.

h.  Trooper Esparza reviewed the contents of the phones regarding which SALAH had provided consent to search.  She was unable to access the Nokia phone that SALAH said he only used for overseas travel.  The other two phones contained little data.  From her review of the other two phones, Trooper Esparza determined that the phone numbers associated with the phones are 279-226-5979 (the white and pink iPhone he claimed he used for Wi-Fi) and 480-689-3264 (the Nokia flip phone).[10]

i.  SALAH was Mirandized at approximately 1:45 p.m. by Trooper Britt Williams.  SALAH continued to speak with the Troopers after being advised of his rights.  SALAH was placed under arrest and handcuffed at approximately 2:58 p.m.

j.  Trooper Esparza told SALAH that she would take him before a judge because his vehicle was not registered, did not have insurance, and was being operated with the wrong registration tags.  SALAH's vehicle was towed to a lot in Balmorhea, Texas because it was unregistered and operating on a public highway.  Trooper McConnell conducted a property inventory of the Land Cruiser before it was towed. Texas State Troopers typically conduct a vehicle inventory before a vehicle is being towed and did so here in part due to the specific nature of this incident.

k.  Trooper Esparza took photographs during the search, several of which are included below.

---

[10] During a follow-up call with Trooper Esparza on November 30, 2023, she clarified that SALAH told Troopers that telephone number 279-226-5979 was associated with the white and pink iPhone. Troopers did not visually verify this information on the white and pink iPhone.

 






47.    Notably, SALAH appears to be wearing the same hat here that he was wearing when he visited the church in Colorado.

40

48.     Per Trooper Esparza, SALAH was taken before a judge that evening.  The judge issued SALAH a fine and released him.

49.     At approximately 9:12 p.m., an agent from the El Paso FBI office contacted the towing company that was in possession of the Land Cruiser.  The individual who answered the phone told the agent that SALAH had already picked up his vehicle.

**I.     SALAH's Return to Phoenix Using Another License Plate**

50.     On the morning of November 26, 2023, law enforcement database information indicated that the Land Cruiser with license plate 122VHT was in Phoenix, Arizona at approximately 8:46 a.m. Notably, this is the license plate that Trooper Esparza found in the Land Cruiser on November 25, 2023. This was not the plate that was on SALAH's vehicle when Trooper Esparza stopped him.  Your affiant spoke with Trooper Esparza about the plates, and she stated that she seized the Texas plate that was on the vehicle when she stopped SALAH.

51.     When the FBI ran the Arizona plate with number 122VHT on November 27, 2023, vehicle records indicated that 122VHT was a removed plate and not associated with a vehicle.

**J.     SALAH is Located in El Cajon and Arrested on State Charges**

52.     On November 27, 2023, the Honorable Allison Claire, United States Magistrate Judge, Eastern District of California, authorized a warrant to obtain precise location data from the cellular phone assigned call number 623-305-1336.  Pursuant to that warrant, on November 28, 2023, at approximately 8:21 a.m., the FBI obtained information indicating that SALAH was in the San Diego area.  Shortly after 8:21 a.m. on November 28, 2023, your affiant was in communication with FBI San Diego regarding SALAH and his whereabouts in the San Diego area.  I received the following information from FBI agents and Task Force Officers in San Diego who were conducting surveillance or otherwise assisting with this investigation:

a.   At 12:07 p.m. FBI San Diego initiated surveillance in El Cajon, California. Surveillance continued from approximately 12:07 p.m. to 8:25 p.m. FBI agents identified SALAH's known light green Prius bearing Arizona license plate 122VHT at 12:30 p.m. As noted above, Arizona license plate 122VHT had been identified by Texas State Trooper Esparza on a previous traffic

41

stop of SALAH in Texas on November 25, 2023, after it was discovered during a vehicle search under the front driver seat of the Land Cruiser**.**

b.  At 2:51 p.m., agents saw SALAH's green Toyota Prius pull into a gas station. At approximately 2:51 p.m., agents saw SALAH open the trunk and pull out a yellow item he filled with gasoline. The yellow bucket appeared to hold 3-5 gallons of gasoline and was placed in the trunk. At 2:54 p.m., SALAH was seen leaving the gas station. At 3:04 p.m., the Prius arrived at an autobody repair shop, where SALAH exited his vehicle, retrieved a yellow gas can from the trunk and entered the business. SALAH was observed by agents interacting with several unidentified males throughout the day at different locations, including at the autobody shop.

53.   Your affiant communicated with an FBI San Diego JTTF Task Force Officer (TFO) who through law enforcement database checks found that that Arizona license plate 122VHT observed on the Prius was reported stolen in Arizona. The TFO contacted the complainant in Arizona and confirmed that the reported plate 122VHT had been stolen from one of their vehicles around the Thanksgiving week. The first time SALAH was known to have license plate 122VHT was on November 25, 2023, after Texas State Trooper Esparza discovered it during her search of the Land Cruiser during a traffic stop in Texas. On the morning of November 26, 2023, law enforcement database information indicated that the Land Cruiser bearing license plate 122VHT was in Phoenix, Arizona at approximately 8:46 a.m. That is the last time the license plate was observed by law enforcement until SALAH was located driving the Prius bearing Arizona plate 122VHT in El Cajon, CA on November 28, 2023.

54.   I received the following information from FBI agents in San Diego who were conducting surveillance or otherwise assisting with this investigation:

a.  At approximately 8:16 p.m., SALAH was pulled over in his Prius by San Diego Police near the intersection of Broadway and Ballantyne in El Cajon, CA for having a stolen license plate on the vehicle. SALAH was arrested without incident at approximately 8:18 p.m. Bomb technicians responded to render the vehicle safe and x-rayed multiple suspicious items, but did not find explosives. Upon a search of the vehicle for additional stolen items, officers discovered a handgun (make and model CZ P-10, serial number G033124) under the driver's side floor mat. A

loaded magazine with 15 hollow point rounds was also located right next to the pistol. A record check showed the handgun registered to a person named Timothy James Metcalf Jr. of Glendale, Arizona. Upon information received from the searching officers and photographs obtained from the search of the vehicle, I have determined that the firearm was the same firearm discovered during the November 25, 2023, traffic stop of SALAH by Texas State Trooper Esparza.

b.  In addition to being arrested in violation of receiving /possession of stolen property, SALAH was also arrested for possession of a loaded gun, 25850 (C)(6) - PC - Carry loaded handgun: not registered owner, and 25850 (A) - PC - Carry loaded firearm on person/vehicle: public place. Additional items found, but not seized in the Prius included two yellow five-gallon plastic gas containers, one blue six-gallon plastic gas container, one small green propane canister, an Arizona traffic ticket dated November 26, 2023 issued for displaying plate suspended for financial responsibility and no proof of insurance, a Waxahachie, Texas ticket dated October 25, 2023 for speeding and no proof of insurance issued to Toyota Prius with Arizona license plate DSA8PD, a black suitcase, a duffle bag, documents containing Arabic writing, a small brown bag, a green cooler, an ammunition cannister, and two cellular telephones. A full inventory was not taken of all items found in the vehicle. The Arizona plate (122VHT), the gun, magazine with 15 rounds of ammunition were impounded at the San Diego Police Department evidence room.

c.  Two cellular telephones were located on SALAH's person. San Diego Police found them when they searched SALAH, and they were seized upon officers finding them.  These were a black/ dark gray iPhone and a white and pink iPhone.  SALAH told law enforcement that the white and pink iPhone was his mother's phone.[11]

d.  SALAH was arrested at approximately 8:18 p.m.  He was transported by San Diego Police to a Port of San Diego Harbor Police Station where he was processed, interviewed, and then transported and booked into jail at San Diego Central Jail.[12]  SALAH's cellular telephones were

---

[11] As noted above, SALAH had told Trooper Esparza that the black/gray iPhone was his mother's phone.

[12] The Prius was impounded and taken to a tow yard in San Diego, CA where it currently remains. As noted below, the Prius is currently in San Diego Harbor Police Department custody at the

43

1
2
3
4
5
6
7

inventoried as part of his personal property pursuant to his arrest by San Diego Police and were transferred from the Harbor Police Station to the San Diego County Sheriff's Department at the San Diego Central Jail, 1173 Front St., San Diego, CA 92101. On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to obtain and search the two cellular telephones, which are being held and processed at the FBI San Diego Field Office, 10385 Vista Sorrento Pkwy, San Diego, CA 92121.

8
9
10
11
12
13
14
15
16

e.  SALAH was Mirandized by Port of San Diego Harbor Police FBI TFO Roberto Padilla and consented to an interview. SALAH denied ever being arrested or placed in handcuffs by law enforcement officers in the past, even though SALAH had been arrested on November 25, 2023, by Texas State Troopers for traffic violations. SALAH stated that he did not own or possess a firearm; however, after being shown a picture of the firearm discovered in his vehicle by San Diego Police, SALAH stated that it was his weapon in the photograph. SALAH stated that he was scared to say he had a gun, and that he bought it from an Iraqi man who left the United States to Iraq. SALAH did not remember the name of the individual he purchased the gun from.[13]

17
18
19
20
21
22
23

f.  SALAH denied meeting with people while in El Cajon on November 28, even though agents had observed him meeting with multiple unknown males before SALAH was arrested. When SALAH was asked why he had a stolen license plate on his vehicle, SALAH denied knowing that he had a stolen plate on his vehicle. SALAH stated that he had a friend named John (LNU) in Arizona who told him that he should take the license plates off his personally owned vehicles at night because people liked to steal license plates. SALAH stated that he must have taken his plates off his Prius at some point and put the wrong plate back on.

24
25

tow yard. On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius. Agents searched the Prius the following day.

26
27

[13] In the official report of SALAH's interview, SALAH stated that he bought the gun about three months ago in Arizona from an Iraqi guy that moved back to Iraq. SALAH believed the name of the person he purchased the gun from was Sam, AKA Salim.

28

44

g.  Regarding the white and pink iPhone, TFO Padilla told me that SALAH identified this device as his mother's phone, and that she had moved to Iraq.[14] SALAH provided pin code 112801 and consented to have the white and pink iPhone searched by interviewing officers. FBI Special Agent Jonathan Mackay spent a few minutes looking through the phone, but SA Mackay did not see much on the phone. TFO Padilla did not notice any cellphone alerts on the device during the interview. SALAH stated that 623-305-1336 was his mother's cellular telephone number, however, neither law enforcement officer was able to confirm that 623-305-1336 was associated with the pink and white iPhone. TFO Padilla stated that at some point after the phones had been seized by San Diego Police, a San Diego Police officer called 623-305-1336 and saw one of SALAH's two iPhone's ringing, but TFO Padilla did not know which device it was that was ringing.

h.  Agent Mackay told me that SALAH stated that one of the two cellphones on SALAH's person was his mother's phone. SALAH stated that his mother's cellphone number was 623-305-1336. Agent Mackay looked through the white and pink iPhone for approximately ten minutes after SALAH consented to the search. Agent Mackay took the phone off airplane mode and began looking through the phone. Agent Mackay looked through text messages, but only saw one text that appeared to include the word "mom" in the text. Agent Mackay clicked on the Facebook application, but it only showed the welcome notification, indicating that there was no account set up on the application. Agent Mackay checked the Safari internet application browser history, but it was blank, indicating there was no internet history. Agent Mackay, based on his observation, stated that the phone appeared to be wiped or not really used. SALAH stated that he used OfferUp, an application used to buy and sell things. However, Agent Mackay did not observe the OfferUp application on the phone.

---

[14] As noted above, Trooper Esparza reported that SALAH told her that the telephone number associated with the white and pink iPhone was 279-226-5979.

i.  Regarding the black/dark gray iPhone, TFO Padilla told me that SALAH stated that it was his personal phone.[15] SALAH unlocked the phone and gave permission for agents to look through it. Agents did not do so, therefore, they did not confirm the telephone number associated with this device. TFO Padilla is unfamiliar with iPhones, so he asked SALAH to find the number on the phone himself, because SALAH had stated he did not remember the number. SALAH unlocked the cellphone himself and told TFO Padilla that the phone number was 279-226-5979.[16] TFO Padilla found $100 in a compartment on the back of the phone case. TFO Padilla did not notice anything else about the phone, and he did not attempt to call the phone.

j.  Agent Mackay told me that he did not know where phones were found during the search, and that he did not search through the black/dark gray iPhone during the interview even though SALAH provided consent. Agent Mackay did not notice anything specific about the black/dark gray iPhone.

k.  In my training and experience, I know that individuals involved in criminal activity will provide conflicting information to law enforcement in an attempt to obfuscate criminal activities on their cellular telephone devices.

l.  On November 29, 2023, FBI San Diego agents interviewed both owners of the aforementioned autobody shop, where SALAH had been observed interacting with unidentified males on November 28, 2023. One of the owners told agents that he had hired SALAH approximately four weeks ago to do basic mechanic work at the shop, and that after working for approximately four days, SALAH stopped showing up for work without any notice. In the last couple days, SALAH randomly returned and stated he was ready to work again. When SALAH returned, he told one of the owners that he previously had an emergency in Sacramento, which is why he unexpectedly had left work, and that now he is back to work.

---

[15] As noted above, SALAH told Trooper Esparza that the black/dark gray iPhone was his mother's phone.

[16] FBI review of SALAH's white and pink Apple iPhone 7 Plus revealed that the latest phone number attributed to the device was 279-226-5979, so it appears SALAH purposefully gave TFO Padilla the wrong phone number for the black/dark gray device.

m.  One owner told interviewing agents that SALAH was asked on November 28, 2023, as part of his job, to fill up a gas can with gasoline. When the owner went to give SALAH a gas can, SALAH stated that he already had one in his Prius, and that he would use that. SALAH then left to fill up the gas can and returned to the shop to use the gas for one of the vehicles he was working on. SALAH had also been asked as part of his job to test drive cars that he was working on that day.

n.  The owner stated that SALAH seemed honest and worked diligently. SALAH was known to sleep in his vehicle and had even parked in the parking lot of a restaurant in the San Diego area owned by a Christian Chaldean, who would do things to take care of him.[17]

o.  The owner received a telephone call from SALAH at approximately 5:30 a.m. on November 29, 2023, asking for help to get out of jail. SALAH stated that he was arrested for having a gun. One owner called the other owner to tell him what happened, and that SALAH needed help getting bail. Both owners agreed not to get him bail, but one owner called an associate of SALAH's family in Virginia who knew SALAH's family, including SALAH's mother. When they told SALAH's family associate about SALAH being arrested, the family associate stated that it was no surprise that SALAH was arrested, and that he had a history of making bad decisions, has had run-ins with authorities since a young age, and that he might have some mental instability.[18]

55.    San Diego Harbor Police FBI TFO Padilla provided the following information to your affiant:  SALAH appeared before a judge in San Diego on charges involving the firearm found in his vehicle and the stolen license plate on his vehicle.  The judge set SALAH's bail at $1,000,000.

56.    On December 1, 2023, the judge ruled that SALAH was not eligible for bail. On December 14, 2023, SALAH appeared in court for a preliminary hearing. After the hearing, the judge determined SALAH to be a danger to the public if released and kept all charges as originally charged.

---

[17] In the official report of the owner's interview, he stated that a majority of SALAH's friends were Christian Chaldean Iraqis, and he never heard him speak bad of Christians.

[18] In the same official report mentioned above, the family associate told the owner that SALAH had mental issues and was aware that he had several run-ins with law enforcement while he lived in Arizona for a period of 20 years.

On February 15, 2024, a trial setting hearing was held before another state judge.  That judge continued SALAH's trial to March 10, 2024, and ordered him released on conditions.  On February 15, 2024, the Honorable Jeremy D. Peterson, United States Magistrate Judge for the Eastern District of California authorized a complaint and arrest warrant for SALAH for a violation of 18 U.S.C. § 1038 (false information and hoaxes).  The FBI served this arrest warrant on the San Diego jail before SALAH was released on bond in his state case.  SALAH was transferred into federal custody and made his initial appearance in the Southern District of California on February 20, 2024.  At a continued detention hearing on February 23, 2024, SALAH was ordered detained.[19]

### K.     SALAH Left a Backpack in the Sanctuary of a Scottsdale, Arizona Church in September 2023

57.     On approximately November 30, 2023, FBI Sacramento was contacted by Arapahoe County Sheriff's Department Captain Kevin Heaton, who had received information that a Christian church in Scottsdale, Arizona had reached out to his department regarding an Information Bulletin highlighting the November 19, 2023, incident where SALAH was identified as acting suspiciously at the Christian church in Greenwood Village, Colorado.

58.     The church reported that on Sunday, September 24, 2023, an individual who appeared to be trying to conceal their identity entered the church, dropped a backpack off during the service, then left on a motorcycle. The individual was dressed in all black with a black mask covering his face. The backpack was left on the floor between the seats in the worship center. He then left and walked around the campus. He appeared to be looking at all the entrances and exits to the property. He was captured on multiple surveillance cameras within the church. He arrived on campus riding a motorcycle which he parked in the north parking lot apparently making sure it was out of camera view. The backpack was searched by Scottsdale Police Department and contained various clothing items. The motorcycle was a

---

[19] SALAH was indicted for a violation of 18 U.S.C. § 1038 (false information and hoaxes) in the Eastern District of California on February 29, 2024.  That indictment is attached hereto as Exhibit A and incorporated herein by reference.  SALAH has since waived an identity hearing in the Southern District of California and has been ordered to be transported to the Eastern District of California.  As of the filing of this affidavit, he has not yet arrived in the Eastern District of California.

newer model white in color with a black luggage box on the rear. The individual arrived at 10:22 a.m. and left at 10:41 a.m. Security was contacted when the backpack was found in the worship center.

59.     Screenshots of the surveillance videos provided by the church are below:







60. The FBI took additional screen captures from the videos that were provided by the church:





52





61.     The church also provided photographs of the contents of the backpack, which included what appears to be a pillow and clothing:








62.     On December 4, 2023, your affiant was contacted by FBI Special Agent Jacob Bailey, who had interviewed SALAH at his Phoenix residence, along with FBI Task Force Officer Steve Denney, on November 21, 2023. SA Bailey stated that the day they interviewed SALAH, there were two motorcycles in SALAH's home. TFO Denney saw one motorcycle that had a plate affixed and the other one did not appear to have a license plate. TFO Denney conducted a database check of license plate KAA80M that was affixed to the motorcycle. The motorcycle came back as a 2020 Kawasaki registered

54

to an individual identified herein as S.M. at an address in Phoenix, AZ that was not SALAH's known residence.

63.   According to a law enforcement database check, the motorcycle with license plate KAA80M was observed driving near SALAH's residence on September 24, 2023, at approximately 9:53 a.m., the same day of the Scottsdale church's incident mentioned above.

64.   A law enforcement database photo of the motorcycle with license plate KAA80M captured on September 24, 2023, at approximately 9:53 a.m., within minutes of SALAH's home, is below. Based on the appearance and license plate, TFO Denney believes this is the same motorcycle he observed in SALAH's Phoenix residence on November 21, 2023.[20]



<hr />

[20] As discussed more fully below, on December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized a search of SALAH's residence located in Phoenix, Arizona. On December 12, 2023, your affiant witnessed this same motorcycle bearing Arizona license plate KAA80M parked inside the residence.

1

2    65.    It is approximately 30 minutes from the location of the law enforcement database photo

3    location above to the Scottsdale church. From the time of the law enforcement database photo above at

4    9:53 a.m. on September 24, 2023, and the arrival of the motorcycle seen in the Scottsdale church

5    surveillance video at 10:22 a.m. on the same day, nearly 30 minutes had passed, the same time it would

6    take to travel between the two locations according to an open-source travel estimate.

7    66.    On December 6, 2023, SA Bailey interviewed S.M., the individual associated with the

8    KAAB0M license plate seen affixed to the motorcycle. S.M. stated that on August 28, 2023, SALAH

9    contacted him on Facebook about the motorcycle which he posted for sale on Facebook Marketplace.

10   SALAH met S.M. in person to look at the motorcycle on the same day and provided a down payment to

11   hold it. SALAH then came back later the same day and paid the full $2,000 in cash for the motorcycle.

12   S.M. provided screenshots from the Facebook Marketplace messages between him and Facebook user,

13   Zimnako Salah. S.M. did not know SALAH before their interactions regarding the motorcycle sale. I

14   reviewed those screenshots and recognize the profile photo for SALAH's account to be SALAH.

15   67.    Law enforcement database information shows the Prius bearing license plate DSA8PD

16   was seen in Glendale, Arizona and Phoenix, Arizona on September 23, 2023 and September 25, 2023.

17   To your affiant's knowledge, the Prius was not seen on September 24, 2023, the date of the Scottsdale

18   church incident.

19   68.    On December 18, 2023, FBI Special Agent Danielle Hines interviewed a member of the

20   Scottsdale church security team, hereinafter referred to as "T.C." During the interview, T.C. provided

21   the following information:

22       a.    T.C. arrived at the church after the backpack was found and initially searched. Officer Rob LNU

23            and T.C. went through the backpack. T.C. then began reviewing security footage from the church

24            and back tracing the individual's movements through the campus. T.C. notified the local police

25            department about the incident and asked them to keep an eye out for the motorcycle in the

26            footage.

27

28

b. T.C. initially believed someone accidently left the backpack. After reviewing the security footage, he believed it was intentionally left. He believed the individual was doing "recon" work. Based on T.C.'s observations from the footage, the individual appeared to be looking for areas to leave things, looking for escape routes, target areas, and testing for reaction time from the staff.

c. The individual wore all black and moved around the campus like he had been to the church before. He dropped the backpack and quickly left. T.C. believed it was a test run for a possible attack and/or possibly a bomb.

d. Church security is now conducting random backpack searches because of the incident.

69.    On December 18, 2023, FBI Special Agent Hines interviewed another member of the Scottsdale church security team, hereinafter referred to as "D.S." During the interview, D.S. provided the following information:

a. D.S. worked as a member of the security team for the Scottsdale church. He heard a call over the radio about the backpack on September 24, 2023. Officer Ashley Hassler from the local police department, who was on duty at the church, lead D.S. to where the backpack was left in the sanctuary of the church. Officer Hassler and D.S. took the backpack to the welcome desk just outside of the sanctuary. Office Hassler put on gloves and checked to see what was inside the backpack. Upon discovering the backpack contained clothing, it was then taken to the church's security office where it was fully searched by officers and church security personnel.

b. Security personnel initially believed the backpack was left by a homeless individual. Upon further inspection of the backpack, security personnel took notice that the backpack was new. After further review of the incident, security and church personnel believed it was a "dry run" for something in the future. They believed the backpack could have been a small bomb and there could be an attempt in the future.

c. Security personnel was concerned over the incident and took the stance, "see something, say something." Security and church personnel are now more sensitive with backpacks and are being more watchful.

70.     Based on the September 24, 2023 surveillance photos of the motorcycle provided by the Scottsdale church, the law enforcement database photo of the motorcycle with license plate KAA80M from September 24, 2023, the information provided by FBI Special Agent Bailey and TFO Denney regarding the motorcycle observed in SALAH's Phoenix residence with license plate KAA80M, the interview of the previous owner stating that he sold the motorcycle to SALAH on August 28, 2023, and the suspicious black backpack left inside the Scottsdale church, your affiant assesses that it was SALAH who drove the motorcycle to the Scottsdale church and left the black backpack in the sanctuary on September 24, 2023.

71.     In addition, the law enforcement database photo of the motorcycle with KAA80M plates, and the Scottsdale church surveillance photo of a motorcycle driven by the individual who left the black backpack in the church, both from September 24, 2023, show that the frame, color, and parts of the motorcycles are very similar if not identical in both photos, including the luggage storage container above the rear of the motorcycles. In both photos the rider/s also appears to be wearing black gloves, black boots, black pants, a black jacket, a dark colored helmet, and a black backpack. The black backpack on the rider/s also appears to be very similar to the photos of the black backpack left in the church included above.

**L.     Law Enforcement Seizes Additional Relevant Evidence Upon Execution of Federal Search Warrant at SALAH's Phoenix, Arizona Residence**

72.     On December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized warrants for the FBI to search SALAH's residence located in Phoenix, Arizona, the 1999 Gold Toyota Land Cruiser; and the 2020 Kawasaki motorcycle.

73.     On December 12, 2023, FBI Phoenix and your affiant served the search warrants and seized and/or observed the following items inside the residence and/or the vehicles (this is not a complete list):

- A 2020 Kawasaki motorcycle bearing Arizona license plate KAA80M found inside the residence living room.

- A black motorcycle helmet and black/red riding gloves from inside the motorcycle's rear storage

compartment.

- A black backpack full of clothing items near the motorcycle.
- A bag of destroyed license plates that were cut into pieces.
- A folder containing multiple license plates not attached to vehicles.
- A bag containing a black hat that was cut into pieces.
- Wiring connected to a large battery and two unknown electrical devices.
- Multiple cellphones.
- A digital camera.
- A GPS device.
- A loaded pistol.
- Two additional motorcycles.
- A 1999 Gold Toyota Land Cruiser.
- Sermon notes from a Church in La Mesa, California dated October 22, 2023.

74.     The motorcycle observed in SALAH's living room bearing Arizona license plate KAA80M appears to be the same motorcycle depicted in the law enforcement database photo mentioned above from the morning of September 24, 2023. The motorcycle and the helmet and gloves worn by the individual that placed a black backpack inside the Scottsdale church on September 24, 2023 resemble the motorcycle, helmet, and gloves found inside SALAH's residence and the motorcycle's rear storage compartment.

75.     Based on the discovery of the destroyed license plates and a black hat that was cut into pieces inside SALAH's residence and Land Cruiser, all of which were listed on Attachment B of the search warrants, your affiant assesses that SALAH was attempting to hide/destroy evidence involving his hoax activities at the Christian churches. In addition, the black hat that was cut up also appeared to have a short bill that resembled the same black hat worn in the Roseville, California church incident.

**M.    Law Enforcement Discovers that SALAH Visited Another Church in La Mesa, California on October 22, 2023**

76.    FBI agents reviewed the aforementioned sermon notes that were found within the residence and determined that they appeared to be from a Christian church in La Mesa, California based on the name of the pastor that was associated with the notes. Based on this information, I contacted TFO Padilla and asked that FBI San Diego make an inquiry with the La Mesa church to determine if they had any recent suspicious incidents.

77.    TFO Padilla contacted your affiant on January 5, 2024, after interviewing a security guard at the La Mesa church. The security staff reported that they remembered a suspicious individual matching SALAH's description on October 22, 2023, the same date as the sermon notes.  The security guard stated that the individual was carrying a backpack and left with the backpack in a Prius with Arizona license plates.  The security guard then provided the following screenshots taken from video surveillance footage at the church:[21]



---

[21] The church security guard stated that the church no longer has the video of the church surveillance footage, but because it was suspicious when this subject was there, they took screenshots and saved them.





78.     On January 5, 2024, TFO Padilla interviewed the Director of Security at the La Mesa church mentioned above.  During the interview, the Director of Security provided the following information:

a.  On Wednesday, October 11, 2023, the preschool Director saw a suspicious Middle Eastern male with a thin build walking around the church property.  She alerted a security officer who also described the subject as a Middle Eastern male, about 40 years old with a thin build.  The security officer trailed the subject and stayed with him until the subject left the property.

61

b. A week later, on Sunday, October 22, 2023, at about 11:05 AM, the same subject was spotted by the kid's ministry staff when they opened the doors for people to check in their kids before the 11:15 AM service.  The subject approached the ministry lobby on the third floor without a child, which made the situation suspicious to church staff.  He was standing in line behind a family and when asked if he needed help, he said he was with the family standing in front of him.  Church staff talked to this family and confirmed the subject standing behind them was not with them.

c. The kid's ministry notified church security and told security to keep an eye on the subject.  As the kid's ministry staff kept looking at the subject, he walked way.

d. An off-duty police officer working church security followed the suspicious subject and saw him entering the men's bathroom inside the church.  Another security officer also walked into the bathroom because he needed to wash his hands and saw the suspicious subject duck into a bathroom stall.  The subject was then followed into the church auditorium where he sat by himself.  Soon after he sat down, the subject got up and walked out of the church.  Another off-duty police officer working church security approached the subject near the front of the church and introduced himself.

e. The subject told the off-duty police officer that he was from a local church in El Cajon, and that a friend had told him to check out the La Mesa church.[22],[23] The subject walked away into the bathroom, and when he came out, he walked back towards the kid's ministry area.  He walked

---

[22] On January 30, 2023, TFO Padilla interviewed the Director of Security and Pastoral Protection (Director) at the El Cajon church mentioned by the subject. The Director was not aware of SALAH or his Prius at their location in El Cajon. The Director stated that the church also had a smaller offsite campus in El Cajon with a Middle Eastern congregation. The Director provided TFO Padilla with information from someone who filled out a contact form at the church by the name of Salah Salah, along with a mobile number. The individual also listed themselves as part of the Arab congregation. The Director did not know if this was SALAH, but only provided the information because of the potential name match. The church entered the information into their database on October 23, 2023, which did not mean the individual was there on that date, but only that it was the date it was entered into the church system. To date, the FBI is not aware of the mobile number being associated with SALAH.

[23] On January 31, 2023, TFO Padilla interviewed the Worship Leader of the Middle Eastern offsite campus mentioned above. The Worship Leader was shown a picture of SALAH and his Prius. The Worship Leader stated that he had not seen SALAH at the Arab congregation and did not remember seeing his vehicle in the parking lot. He stated that he was "100% sure" SALAH had not been at the Arab congregation church.

down the stairs and down to the lower parking lot and got into a gold/silver colored, older model Prius.  Security personnel were unsure but believed the Prius had an Arizona license plate but were not able to read it.  The subject drove away quickly out of the parking lot and left the property.

79.     Law enforcement database information places SALAH's Toyota Prius with an Arizona license plate (DSA8PD) in El Cajon, California on October 19, 2023 at approximately 3:17 PM PDT. The next instance that Law Enforcement Database information places SALAH's Toyota Prius with an Arizona license plate is in Phoenix, Arizona on October 22, 2023 at approximately 7:26 PM PDT.[24] The timestamp on the October 22, 2023 screenshot from the church is 11:05 AM PDT and that is sensible as Sunday church times at the La Mesa church are 8:00AM, 9:30AM, and 11:15AM.[25] According to Google Maps, the travel time between the church in La Mesa, California and Phoenix, Arizona is approximately five and one half to six hours.  This travel time is within the timeframe of 11:15 AM PDT to 7:26:50 PM PDT.

80.     Based on previous review of video surveillance footage of SALAH as well SALAH's previously documented activities at the Roseville, California church, the Greenwood Village, Colorado church, and the Scottsdale, Arizona church, I believe the individual at the La Mesa church on October 22, 2023 was SALAH. As he did in the Roseville, California church incident and the Greenwood Village, Colorado church incident, SALAH immediately returned to Phoenix, Arizona after visiting the church. An additional note of concern is that it appears SALAH was located within the children's building associated with the La Mesa church. It is my understanding that the children's building is separate and apart from the main church building.[26]

81.     This represents the fourth Christian church that the FBI has identified wherein SALAH

---

[24] At this time your affiant is not aware of any other dates or times that SALAH's Toyota Prius with an Arizona license plate was identified in Law Enforcement Databases from October 19, 2023 to October 22, 2023.

[25] The timestamp on the photo showing 2:15 PM was from the church staff/volunteer who took the photo on their personal cellphone of the surveillance video screen.

[26] The FBI investigation of SALAH has not revealed that SALAH has children.

participated in a hoax or hoax-like suspicious activities. Based on FBI interviews and a review of SALAH's Apple iPhone 7 Plus, SALAH is currently a practicing Muslim.

**N.    Information Obtained Showing That SALAH Was Renting a Storage Unit in Colorado Near the Church He Visited There**

82.    On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius and to affix a tracker. Your affiant was not present for the search.

83.    On December 13, 2023, FBI San Diego and a Task Force Officer from the San Diego Harbor Police Department transported the Prius from the tow yard to the FBI San Diego office, where it was subsequently searched and a tracker was affixed. The following items were seized and/or observed (this is not a complete list):

- Ball bearings and loose screws, bolts, and nails.

- Stevinson Toyota East, Aurora, Colorado documents dated November 17, 2023.

- A black hat.

- A black Nike hat.

- A Hawke & Co black puffy jacket.

- A black backpack.

- A document containing a CubeSmart billing history for cube A26 located in Denver, Colorado on East Warren Avenue.

- Hardy brand black gloves.

- A Dickies black jacket with an attached gray hood.

84.    Your affiant observed a photograph from the search of the Prius which showed a billing history bearing the title "ZIMNAKO SALAH SALAH […] Cube A26." The name and address of the storage facility that issued the statement was a business in Denver, Colorado. The billing history included a report for November 15, 2023, showing that SALAH paid $340.29 cash on October 7, 2023 for Unit A26, which is a 12x30x8 foot unit.

85.    On December 14, 2023, your affiant called the storage business and spoke to E.H., the

manager of the facility. During the interview, E.H. provided the following information:

a. E.H. is the manager of the storage facility. He is aware of Zimnako SALAH as a current customer who is renting cube A26, a 12x30 foot storage unit. SALAH has a past due balance on his storage unit.

b. On November 18, 2023, E.H. personally came in contact with SALAH at the storage facility. E.H. stated that there were several red flags with SALAH, such as SALAH breaking the storage facility policies. There were two specific incidents that caused E.H. concern. E.H. did not want to go into specific details about the policy issues, but SALAH was about to be evicted from the business. One problem was that SALAH appeared to stay overnight in his personal vehicle at the storage facility, which was not allowed.

c. E.H. has observed SALAH driving a Toyota Prius that appeared to be gray/silver, but he was not completely sure about the color. SALAH started renting the storage unit on October 7, 2023. The license plate on the Prius appeared to be from Arizona. E.H. observed a portion of the license plate number, which appeared to start with DSA.[27]

d. E.H. has personal cellphone video of SALAH that he took on November 18, 2023, after there was an incident with SALAH breaking policy at the storage facility. Aside from the Prius, SALAH was also seen on the business's surveillance cameras on a different date driving what appeared to be a Subaru Wagon or a Toyota Highlander with a hitch on the back towing a motorcycle. E.H. was not certain about the make and model of the vehicle, but he knew it was SALAH based on the surveillance footage. E.H. personally witnessed SALAH's Prius inside the storage unit on November 18, 2023, which is one day prior to the suspicious incident that occurred at the church in Greenwood Village, Colorado, as discussed previously.

86.     Your affiant conducted an open-source search to find the approximate distance between the storage unit and the Greenwood Village church. It is approximately 5.6 miles and 18 minutes between both locations, according to open-source information.

---

[27] As mentioned above, SALAH's Prius is registered with Arizona license plate DSA8PD.

87.     Based on a review of law enforcement database information, your affiant is not aware of any information indicating that SALAH has maintained employment and/or a residence in Colorado. The FBI also does not have any information to suggest that SALAH has close family members who reside in Colorado, nor does he appear to have strong ties to Colorado.[28]

**O.     SALAH's Storage Unit Contained Destructive Device Components and Antisemitic Language Spray Painted on the Wall**

88.     On December 27, 2023, the Honorable S. Kato Crews, United States Magistrate Judge, District of Colorado, authorized a warrant for the FBI to search the aforementioned storage unit in Denver, Colorado as part of an ongoing investigation involving the aforementioned federal criminal statutes.

89.     On December 28, 2023, FBI agents executed of the search of the storage unit. Your affiant was not present for the search. Agents seized a red hat and a black hat during this search.

90.     On December 28, 2023, your affiant reviewed the search photos taken during the search of the storage unit and observed the following items (this is not a complete list):

- Red and white electrical wires modified with electrical tape and nails affixed to a battery.

- A black neoprene case with what appear to be electrical wires attached to it or near to it.

- Wire cutters lying on the floor next to the modified electrical wires.

- A strip of silver/gray duct tape with nails affixed to the adhesive side of the tape lying on top of a blanket.

- A receipt from a store lying next to the aforementioned duct tape with nails affixed.

- A second strip of duct tape with nails affixed to the adhesive side of the tape, lying on the floor next to the bed matt, with lose nails and at least one visible ball bearing surrounding it.

---

[28] During his interview on November 21, 2023, SALAH told FBI agents that he went to Colorado on November 15, 2023 to look for work. He stated that he worked for an individual named Abu Aya who was renting a warehouse. SALAH said he worked for Abu Aya for two days but never received payment. SALAH said he left the warehouse because Abu Aya was cheating customers. The FBI has been unable to corroborate this information. SALAH also denied ever going to a church in Colorado and when he was shown a photograph of himself at the church, he agreed that it was him and asked if it was illegal to go to churches.

- A Coleman propane canister next to what appears to be an Islamic Koran near the head of the bed matt. The propane canister had strips of what appear to be the same silver/gray duct tape stuck to the canister, along with a white electrical wire protruding from the neck of the propane canister with electrical tape around the wire and port.

- Two additional propane canisters without electrical wires or tape affixed.

- A box of ignition coils lying on the floor next to the propane canisters.

- Kurdish Arabic words spray painted in large, black lettering on the wall of the storage unit.

- A plastic bag next to a packaged battery and an empty battery package on the floor.

- Plastic bags with what appear to be items inside of them lying on the floor.

91.     Based on your affiant's training and experience, I identified many of the aforementioned items in the photographs as evidence pertaining to hoax bombs and bombs, namely containers containing flammable substances, possible explosives, possible bombs, and bomb-making equipment or supplies.

92.     On December 28, 2023, your affiant confirmed that a Special Agent Bomb Technician (SABT) was not present during the execution of the search warrant.

93.     On December 28, 2023, your affiant contacted an FBI Sacramento SABT David Doh,[29] who also reviewed the search photos. The SABT stated that the propane canister with the white electrical wire protruding near the port of the canister appeared to be modified, and that only SABTs should handle the canister.[30] The red and white electrical wire with the nails affixed to a battery appeared to be configured to conduct an electric current that could potentially be used as part of an

---

[29] In 2021, SABT Doh attended the 240-hour FBI certified course on Hazardous Devices Basic Course in which he learned about explosives, explosives components, electric components, hazardous device designs and theories, fuses, and detonators, chemical components, use for weapons of mass destruction, destructive devices, and chemical weapons. He also learned how destructive devices are designed, built and designed to function. He also learned how to identify the components of destructive devices after an explosion and learned basic post blast investigations.  SABT Doh has participated in at least 12 different destructive device investigations that involved actual devices since he was certified in 2021.

[30] Agents executing the search initially assessed that the propane canisters were used to warm the unit.

explosive device and/or a hoax device. The silver/gray duct tape with nails affixed to the adhesive could be used as shrapnel on an explosive device and/or a hoax device. The SABT also noted that it was concerning that the nails appeared to be new. The SABT conducted an open-source search of the ignition coils, which showed that the coils are designed to produce the high voltage necessary to ignite an air/fuel mixture in a combustion chamber. Based on the description, the SABT assessed that there is the potential for the ignition coils to be modified and used in an explosive device. The SABT stated that based on the photographs and his training and experience, the combined parts in the photos appeared to be modified in order to potentially make an explosive device and/or a hoax device. The SABT stated that any future FBI search should include SABTs in order to further assess the materials/devices, and to ensure the safety of the storage facility and the search scene.

94.     On December 29, 2023, a certified FBI Kurdish Arabic linguist translated the spray-painted black Kurdish Arabic writing on the wall of the storage unit.[31] The FBI linguist stated the following: "The two words on top of each other on the right side says: Asshole [or: Fucking, or: Stupid] Jew[.] The two words on top of each other on the left side says: Allah… Muhammad[.]" The photos below include those observed by your affiant, which were taken by the search team photographer (these are not all of the photographs):

---

[31] A can of black spray-paint was found within SALAH's Toyota Prius during the FBI search of that vehicle on December 13, 2023.

















**P.**     **Second Federal Search Warrant Served on SALAH's Storage Unit**

95.     On January 17, 2024, the Honorable Scott T. Varholak, United States Magistrate Judge, District of Colorado, authorized a warrant for the FBI to conduct a second search of the aforementioned storage unit.

96.     On January 17, 2024, FBI agents executed the search of the storage unit. Your affiant was present for the search, along with an FBI SABT. The following items were seized:

- Duct tape with nails affixed.
- Duct tape.
- A used paper towel and tape.
- Red and white wires attached to a battery.
- A larger duct tape strip with nails affixed and a 9-volt battery.
- Nails, ball bearings, and nuts and bolts.
- A Battery and micro-USB cable.
- A box of seven Duralast ignition coils.
- Wire cutters.
- A Coleman propane tank with silver/gray duct tape stuck to the canister, along with a white electrical wire protruding from the neck of the propane canister with black electrical tape around the wire and port.
- A second Coleman propane tank.
- A yellow propane tank.

97.     SABTs x-rayed the Coleman propane tank with the white electrical wire mentioned above at the search scene. SABT Doh assessed that the white electrical wire did not appear to go inside the tank, but it was wrapped around the neck of the canister near the port and taped down with electrical tape. There did not appear to be any foreign substance inside the tank other than propane. SABT Doh assessed that the electrical wire was likely not capable of igniting the propane tank with an electrical current based on the position of the wire. SABT Doh assessed that the material in the storage unit mentioned above was likely being used for a hoax bomb device or possibly being used to attempt to

make a viable explosive device. FBI Sacramento is sending the materials to the FBI Terrorist Explosive Device Analytic Center for further analysis.

98.     Based on the facts involving the storage unit, the FBI assesses that the storage unit may have been used by SALAH as a staging and/or storage location for items involving his suspicious hoax-like activities at the churches in La Mesa, California on October 22, 2023 and Greenwood Village, Colorado on November 19, 2023, and the previous hoax incidents at the Roseville, California church on November 12, 2023, and the Scottsdale, Arizona church on September 24, 2023.

## Q.     Search of SALAH's Digital Devices to Date

99.     On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized search warrants for two cell phones seized from SALAH upon his arrest on the aforementioned state charges.

100.     Pursuant to the above-referenced search warrant issued in the District of Arizona, the FBI seized three cellular telephones from SALAH's residence. Additionally, on February 8, 2024, the Honorable Steve B. Chu, United States Magistrate Judge, Southern District of California, authorized the seizure of two additional cellular telephones found in SALAH's Toyota Prius.

101.     To date, the FBI has been able to access four of these devices and has found the following relevant information:

a.   Location data for SALAH leading up to his arrest.  The location data shows SALAH's last visits to Dallas, TX and El Cajon, CA in November 2023.

b.   Various cached images[32] which concern weapons, military, the current conflict in Israel, ISIS, Christianity and/or Judaism.  Your affiant has included some examples of these images below.

---

[32] Cached data is all the files, images, and scripts that are stored on an individual's digital device after the device visits a website. This makes reopening websites and applications much faster, which improves the user's online experience.

1

2

3

4

5

6

7

8

9

10

11

12

13

14





15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

» **Images**                    Go to ▾

5

Details        Events (0)

6



7

8

9

10

11

12

13

14

15

Save

16

**Name:**        https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%
2Feh80g5Qcwj8%2Fframe0%
2Ejpg_embedded_1.jpg

17

**Type:**        Images

18

**Size (bytes):**  22184

**Path:**        f0d6daf6296ee7664c549126cf8e289cb73ef876_f
iles_full.zip/private/var/mobile/Containers/Data/
Application/0CD70485-8E43-4EFB-9778-97388E
651CB9/Library/Caches/
com.pinterest.PINDiskCache.com.youtube.innert
ube.imageservice.cache/https%3A%2F%2Fi%
2Eytimg%2Ecom%2Fvi%2Feh80g5Qcwj8%
2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%
2Ecom%2Fvi%2Feh80g5Qcwj8%2Fframe0%
2Ejpg_embedded_1.jpg

19

20

21

22

23

» **Images**                    Go to ▾

Details        Events (0)



Save

**Name:**        https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%
2FgP6-DBKljhU%2Fframe0%
2Ejpg_embedded_1.jpg

**Type:**        Images

**Size (bytes):**  32623

**Path:**        f0d6daf6296ee7664c549126cf8e289cb73ef876_f
iles_full.zip/private/var/mobile/Containers/Data/
Application/0CD70485-8E43-4EFB-9778-97388E
651CB9/Library/Caches/
com.pinterest.PINDiskCache.com.youtube.innert
ube.imageservice.cache/https%3A%2F%2Fi%
2Eytimg%2Ecom%2Fvi%2FgP6-DBKljhU%
2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%
2Ecom%2Fvi%2FgP6-DBKljhU%2Fframe0%
2Ejpg_embedded_1.jpg

24

25

26

27

28

76

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



77

>> **Images**                                         Go to ▾

**Details**                              Events (0)

خۆشترین شت شکاندنی پۆرتی مولحیدێکه
🥮💔



Save

| | |
|---|---|
| **Name:** | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgItQ%2Fframe0%2Ejpg_embedded_1.jpg |
| **Type:** | Images |
| **Size (bytes):** | 12897 |
| **Path:** | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgItQ%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgItQ%2Fframe0%2Ejpg_embedded_1.jpg |

78

» **Images**                                    Go to ▾

| Details | Events (0) |



TRT عربي

📍 غزة

"القسام" تقصف
بالهاون ومضادات طائرات

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 46872 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg_embedded_1.jpg |

» **Images**                                    Go to ▾

| Details | Events (0) |

Save

| Name: | https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 61345 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q/https%3A%2F%2Flh3%2E |

79

**R.     The Roseville Church is Used in Interstate Commerce**

102.     Evidence indicating that the Christian church in Roseville is "real … property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce…" pursuant to section 844(i) is as follows.  The information about the church's practices below was provided by the church's pastor.

a.  The church has a collocated and co-owned private elementary school that charges students a fee to attend;

b.  The church maintains a cafeteria onsite where it charges its visitors for food and drink, including Coke products and name brand candy bars (M&Ms, Snickers etc).   The supplies for the cafeteria are ordered through Sysco, Peets coffee and local vendors.

- Your affiant reviewed Sysco's website, sysco.com, in which Sysco is described as "the global leader in selling, marketing and distributing food products to restaurants, healthcare and educational facilities, lodging establishments and other customers who prepare meals away from home. Its family of products also includes equipment and supplies for the foodservice and hospitality industries. With more than 72,000 colleagues, the company operates 334 distribution facilities worldwide and serves approximately 725,000 customer locations …"

- According to Peet's website, it is headquartered in California but has stores in Arizona, Colorado, Texas, Illinois, Michigan, Tennessee, Maryland, Virginia, Washington, D.C., and New York.

- According to its website, Coca-Cola is headquartered in Atlanta, Georgia and provides beverages around the world.  See coca-colacompany.com/about-us and coca-colacompany.com/careers/location

- Mars is the maker of M&Ms and Snickers and is headquartered in Virginia.  See craft.co/mars/locations

c.  Pens used by the church on weekends that are printed with the church's logo are shipped from China;

d.  Communion cups that the church uses weekly are shipped from Arizona;

e.  Many of the church's ministry supplies are ordered through Amazon which come from all over the country and outside the United States;

f.  Ministry supplies are also ordered through Concordia.  This includes battery operated candles for the church's Christmas services;

- A review of Concordia Supply's website indicates that they are a California company that provides supplies nationwide and that ships products from Kentucky (including candlelight), Indiana, Michigan, South Dakota, and California

g.  The church purchases Bibles through Zondervan international;

- According to Zondervan's website, it operates out of Michigan and its products are sold is more than 100 countries.

h.  The church routinely purchases food items from Costco, Smart and Final, and Sam's Club;

i.  The church purchases hundreds of t-shirts for volunteers several times a year, some of which are purchased from Cambodia or China;

j.  The church purchases and rents a lot of equipment though Illuminate Production Services

- According to Illuminate Production Services website at lightingips.com/contact, the company has offices in California and Florida and provides services nationwide.

k.  The church has seven campuses with over 200 employees and over 12,000 in attendance each week.  Two other campuses have cafes with similar vendors.

l.  The church hosts several large-scale conferences a year called Thrive Conference that have a global and local reach.  Several thousand attend in person but content is also streamed internationally.

m.  Regarding church employees, the church uses various programs that are based outside of California such as Paychex, Concur, Leadr, monday.com

- According to Paychex website, it is a publicly traded company that has clients in the United States and Europe.  See https://www.paychex.com/corporate

81

- According to its website, Concur is headquartered in Washington with offices worldwide. See https://www.concur.com/en-us/contact/offices

- According to its website, Leadr is headquartered in Texas

- According to its website, Monday.com is a publicly traded company with offices nationwide. See https://monday.com/p/about/

n. The church provides financial resources to AIM (Agape International Missions), registered in the United States, to combat sex trafficking overseas.

o. The church raises funds and provide financial resources to Convoy of Hope who sends/uses their financial support for overseas needs/issues.  Convoy of Hope headquarters is in Springfield, Missouri.

p. The church has provided relief to missions' organizations around the world in times of earthquakes, fires, and war.

### S.    Training and Experience Regarding Individuals Who Conduct Acts of Mass Violence

103.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.    Based on my training, experience, and knowledge of this investigation, I know that individuals who intend to conduct acts of mass violence in a public place will communicate their plans to other individuals, often via a digital device.  Additionally, individuals will conduct research and purchase materials online in preparation for the attack. These individuals may also conduct dry runs to ensure the success of their actual attack and evidence of these dry runs can be saved digitally. Dry runs are usually conducted by driving past or even penetrating the target, moving into sensitive areas, and observing security and law enforcement responses. The seven signs of an impending planned attack are as follows: Surveillance, Elicitation, Tests of Security, Acquiring supplies, Suspicious people who do not belong, Dry or trial runs, and Deploying assets or getting into position. Evidence of these signs can be saved digitally. Examples include saving floor plans, blueprints, or Google maps of locations to be targeted; Google searches to obtain information concerning locations to be targeted; Evidence of false or

82

stolen identification documents to gain entry to the location to be targeted; Photographs or videos of locations to be targeted, etc. Law enforcement depends heavily on finding evidence of these activities prior to an act of violence occurring.

b.      Based on my training, experience, and knowledge of this investigation, I know that individuals who intend to conduct acts of mass violence generally are not radicalized overnight, can plan their attacks for years, and their motivations may have evolved over many years.  Likewise, an individual's motives for bomb hoaxes can date back many years.

c.      Many people keep mementos of their firearms and destructive, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

d.      Based on conversations with other law enforcement officers, I know that individuals who intend to use explosives in a public place research online or learn from other individuals how to build and detonate improvised explosive devices (IEDs).  Individuals will acquire various components, supplies, and chemicals used to build IEDs.  Many of these components can be purchased locally and online with little or no documentation from the seller.  For example, a pipe bomb can be constructed with only a pipe, explosive material, two end caps, and an ignition source.

## I.      FACILITIES TO BE SEARCHED

104.    I submit that there is probable cause to believe SALAH has violated 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes), by leaving hoax backpacks at religious institutions. I am seeking this warrant for authorization to search for evidence of those alleged crimes as set out in Attachments B-1, B-2, and B-3.

105.    Based on information SALAH provided on his United States passport application, I am aware that SALAH is associated with e-mail address zimnako1979@gmail.com.  Additionally, SALAH's first name is Zimnako and he was born in 1979. According to information provided by Google, email address zimnako1979@gmail.com and recovery email address miketoyotaaz4x4@gmail.com are associated with Google Account ID 65304195696.  Based on

information provided by Google, I am aware that the Google Account was created on or about June 5, 2011, and that Google last recorded a login on for zimnako1979@gmail.com on or about November 28, 2023.  Based on information provided by Google and open-source research conducted by the FBI, email address zimnako1979@gmail.com is associated with YouTube channel URL youtube.com/channel/@zimnako1979 associated with display name "Mike AZ" and Google ID 65304195696 (the **YouTube Account**).

106.    Based on information provided by Meta, I am aware that SALAH's telephone number 623-305-1336[33] is associated with Facebook account ID 100067031421745 (the **Facebook Account**), a Facebook account in the name of Zimnako Salah.

107.    Based on information provided by Apple, I am aware that SALAH's email address zimnako1979@gmail.com is associated with Apple DSID 1522632377, and associated with customer name, "Mike Saley" (**Apple Account 1**).

108.    Additionally, based on information provided by Apple, I am aware that an email address utilized by SALAH, kotreafry@icloud.com, is associated with Apple DSID 20604610404 associated with customer name, Aishah Hama Almin (**Apple Account 2**).

A.    <u>Evidence demonstrating SALAH's use of the YouTube Account</u>

109.    As stated above, SALAH told Trooper Esparza that he used his mother's phone to view YouTube and social media.  An FBI review of SALAH's Apple iPhone 7 Plus revealed that SALAH appears to have accessed YouTube during the time frame of on or about November 22, 2023, through November 28, 2023, thus demonstrating his current use of YouTube.[34] Based on a review of the phone, SALAH appears to have accessed YouTube while he was located in Phoenix, Arizona, during his last trip to Dallas, Texas, and shortly before his arrest on state charges in El Cajon, California.

---

[33] Telephone number 480-522-0691, another telephone number known to be used by SALAH, was listed as a previous telephone number associated with this same Facebook Account. Meta reported that 480-522-0691 was verified on August 26, 2023.

[34] FBI review of the digital extraction of this device revealed the device captured the times when SALAH accessed YouTube through Installed Applications, Application Usage Logs, and Log Entries, but at this time it appears that SALAH's searches in YouTube and what he viewed are not located on the device.

110.     The FBI conducted open-source research on YouTube by entering "zimnako1979" in the search bar on YouTube and the results page listed one account with a username of @zimnako1979 and a display name of "Mike AZ". Under the user result was a video uploaded by Mike AZ approximately three years ago with a date of May 5, 2020, titled "87 Honda quad 300ATV". At the time the FBI accessed the video, the video had 19 views and was 3:03 minutes long.

111.     The referenced video was the only upload listed on the account for public viewing. Additionally, the account information only listed one video associated with the account.

112.     The **YouTube Account** had one created playlist available for public viewing. The playlist was titled "Favorites" and was associated with 29 YouTube videos. A banner at the top of the playlist stated, "11 unavailable videos are hidden". It was last updated on September 26, 2019. The following video titles that may be pertinent to this investigation were accessible on the account:[35]

     (1) Jehova Witness Visits Sheikh Deedat - Shiek Ahmed Deedat Sexual Desires - Nouman Ali Khan - Quran Weekly

     (2) Beginner Skulls

     (3) 6 year old Iraqi girls forced into prostitution

113.     Additionally, the **YouTube Account** had several subscriptions that may or may not be relevant to this investigation.

114.     The "Community" tab on the **YouTube Account** was blank and did not return any information.

115.     The **YouTube Account** was associated with a YouTube channel located at youtube.com/channel/@zimnako1979. Based on my training and experience, I believe SALAH uses the account due to the association with SALAH's known email address. Based on my training, experience, and my knowledge of this investigation, including what the FBI was able to ascertain about SALAH's use of YouTube from open-source information (both the content of the videos and the timing of SALAH's use of YouTube), there is probable cause to believe that evidence of the aforementioned

---

[35] This is not a complete list as other videos not relevant to the investigation were also identified.

violations will be found in SALAH's YouTube account including that SALAH may use YouTube to research and consume material associated with targeting religious institutions, bomb-making, and hoaxes.

116.     According to information provided by Google in January 2024, SALAH's Google Account ID 65304195696 is associated with YouTube and YouTube Music. This search warrant seeks information maintained by Google specifically relating to SALAH's use of the **YouTube Account**.

### B.     Information about Google and YouTube

117.     Based on my training and experience, I am aware that Google LLC provides a variety of on-line services, including electronic mail ("email") access, to the public. Google LLC allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with Google LLC. During the registration process, Google LLC asks subscribers to provide basic personal information. Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

118.     YouTube is a subsidiary of Google. YouTube offers users the ability to upload, share, and view videos, and interact with other users. Users can create YouTube channels where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like and comment on videos, share videos with others, and save videos to watch later. More than one user can share control of a YouTube channel. YouTube captures and retains information related to this content and activity, which may include a user's searches, watch history, likes, comments, and change history to posted videos. YouTube is a subsidiary of Google, located in Mountain View, California, and requires its registered users to have Google user accounts. Google retains and stores the registration information, IP logs, electronic communications, and YouTube access history associated with a Google user's activity on YouTube.

119.     I know that Google is owned by Alphabet Inc., headquartered in Mountain View, California, that provides email accounts using the domain name Gmail, and stores their users' registration information, IP logs, and email content.

120.     Google offers a service through which a computer user can search webpages for text that the user enters. Under some circumstances, Google saves the user's text searches to the user's account. For users who enable the feature, Google will maintain Web History, recording information about the user's online activity. Web History records may include, among other things, the Google searches the user conducts, the web sites the user visits, and the videos the user watches. Google's Web and App Activity records for a user may similarly save the user's search activity on applications and browsers, including information about the websites the user visits; the applications that he uses; advertisements that the user clicks; and the user's location, language, and IP address. This activity information can be saved even when the user is offline. Based on my training and experience, I am aware that a user's web and search history may include evidence of the crime itself as well as the user's identity and state of mind. Similarly, Google allows users to save to their account certain data relating to their use of Chrome, Google's web browser, including search history, bookmarks, and other settings. The data is stored on Google's servers and made available to the user wherever Chrome is used, regardless of the device or location. Based on my training and experience, information associated with Google Chrome may constitute evidence of the crime, as well as indicate the user's identity and location.

121.     Google provides services called Google Drive and Google Keep. Google Drive allows users to create, store, edit, and share files, including, through a suite of productivity apps (Docs, Sheets, and Slides), documents, spreadsheets, and presentations. Google Drive may also contain data used by third-party apps, including backup files for instant messaging applications. Google Keep allows users to quickly create, update, and share notes and lists. Users can also add images to notes and lists created with Google Keep. Files on Google Drive, and notes and lists on Google Keep, remain on Google servers indefinitely unless deleted by the user, and for a period of time following deletion. In my training and experience, evidence of who was using a Google account, and evidence related to criminal activity of the kind described above, may be found in these files and records.

122.     As explained herein, information stored in connection with the YouTube channel and associated Google account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with a YouTube account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the YouTube provider can show how and when the account was accessed or used. For example, as described below, YouTube providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

123.     YouTube allows users to watch and share videos and other content, provides a forum for people to comment or exchange messages, and post content, such as videos, to YouTube for others to consume or distribute. I know YouTube allows users without a Google account to access limited features, such as browsing and searching content. However, a user needs a Google account to use features such as commenting on videos, liking videos, subscribing to channels, and creating your own YouTube channel. Due to SALAH's use of these YouTube features and information captured in this

investigation, this search warrant seeks to capture SALAH's comments on videos, videos SALAH viewed, likes or other interactions with videos that may relate to violence and fear. I believe information captured on YouTube may reveal additional activity by SALAH which pertains to topics such as targeting religious institutions, bomb-making, and hoaxes.

**C.**     **Evidence demonstrating SALAH's use of the Facebook Account**

124.     As discussed above, SALAH utilized Facebook Marketplace in August 2023 to purchase a motorcycle that is believed to have then been used by SALAH to perpetrate the suspicious church incident in Scottsdale, Arizona a few weeks later on September 24, 2023.

125.     An FBI review of SALAH's iPhone 7 plus revealed that SALAH appears to have accessed Facebook while he was located in El Cajon, California on or about November 27, 2023, shortly before his arrest by San Diego Police, thus demonstrating his current use of Facebook.[36]

126.     An open source review of SALAH's Facebook account by the FBI revealed that SALAH's Facebook account is locked and only SALAH's Facebook friends can openly view his account.

**D.**     **Information about Facebook**

127.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

128.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone

---

[36] FBI review of the digital extraction of this device revealed the device captured the times when SALAH accessed Facebook through Installed Applications, Applications Usage Logs and Log Entries, but at this time it appears that SALAH's searches in Facebook, what he viewed, and his possible Facebook communications are not located on the device.

numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

129.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

130.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

131.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their

geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

132.   Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

133.   Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

134.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

135.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

136.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

137.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as

"liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

138.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

139.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile

page.

140.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

141.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

142.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

143.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

144.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

145.     Based on my training and experience, I am aware that friends, associates, or total strangers often discuss on social media platforms their views or activities in support of groups or causes. I also understand that members or supporters of different groups use Facebook and other social media platforms to communicate with one another and to attract followers.  Sometimes, members of these groups use platforms such as Facebook as a precursor to, or in conjunction with, the use of other encrypted messaging applications.  Facebook communications may be public with other Facebook users or private via Facebook Messenger.  I am also aware Facebook may store information pertaining to payment methods for services including credit card and bank account information.  I believe the stored communications captured by Facebook may reveal activity by SALAH which pertains to topics such as targeting religious institutions, bomb-making, and hoaxes.  Similarly, a review of SALAH's past and current Facebook friends and/or communicants may reveal additional persons who are involved in or aware of SALAH's suspicious hoax activities.

### E.     Information Demonstrating that SALAH Used Apple Account 1

146.     Based on records received from Apple, the following evidence indicates that SALAH created an Apple account bearing, Apple DSID 1522632377 (**Apple Account 1**) on or about June 19, 2013, from an IP address that resolved to Phoenix, Arizona.  As noted above, SALAH has resided in Arizona for approximately 20 years.  Information captured upon account creation listed the name "Mike Saley" as the customer name and included known SALAH phone number 480-259-1225,[37] an alternate phone number 623-329-4360, email address, zimnako1979@gmail.com,[38] and a prior known residential

---

[37] Consumer database checks reveal that this telephone number was associated with SALAH.

[38] Additional alternate email addresses for this account were included in the information that the FBI received from Apple such as zimnako.350z@gmail.com (Apple indicated that this account had not been verified by the user), avanavan1979@gmail.com (Apple indicated that it had sent a verification email to this account), and mike.love.usa@icloud.com (rescue)(Apple indicated that it had sent a verification email to this account).

address for SALAH in Glendale, Arizona.[39]

**F.**    **Information Demonstrating that SALAH Used Apple Account 2**

147.    Based on records received from Apple, the following evidence indicates that SALAH created an Apple account bearing, Apple DSID 20604610404 (**Apple Account 2**) on or about May 03, 2022, from an IP address that resolved to Phoenix, Arizona. Information captured upon account creation listed the name "Aishah Hama Almin" as the customer name and included phone number 623-755-5195, email address kotreafry@icloud.com, and address 3751 Ave. Dr., Phoenix, Arizona 85051.[40] The device that was registered to this account on May 3, 2022 is listed as an iPhone 7 Plus Rose Gold.

148.    On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to obtain and search the two cellular telephones that were found in SALAH's possession upon his arrest by San Diego Police. One of these devices was an Apple iPhone 7 Plus Rose Gold associated with email account kotreafry@icloud.com. As noted above, the telephone number associated with this device at the time of SALAH's arrest was 279-226-5979.[41] The user account on this device is listed as "Aishah Hama Almin, kotreafry@icloud.com." Items found on this device demonstrating that SALAH used **Apple Account 2** included the following:[42]

    i)   The device was seized from SALAH, and the search of the device revealed that the User Account for the device is **"Aishah Hama Almin",** kotreafry@icloud.com.

    ii)   The device appears to have been factory reset (wiped) on May 3, 2022. Shortly after that, the kotreafry@icloud.com account was registered on this device with the following information: Device Name: "Aishah's phone" associated with Apple ID having email address

---

[39] "Mike" is a known alias of SALAH.

[40] This telephone number and address are not known by the FBI to be associated with SALAH.

[41] Telephone number 623-755-5195 was listed as a saved contact on this device.  As noted above, 623-755-5195 was included among the information captured at account creation for **Apple Account 2.**

[42] Although the FBI has thoroughly searched the digital extraction of this device, there may be data that is saved in the Apple iCloud that is no longer located on the device or was provided in the digital extraction.

kotreafry@icloud.com and telephone number 602-586-9402.[43]

iii) The following emails were found on this device: kotreafry@icloud.com received a welcome email from Apple and the following notification email: Dear Aishah Hama almin, Your Apple ID (kotreafry@icloud.com) was used to sign into iCloud on an iPhone 7 Plus. Date and Time: May 3, 2022, 5:19 AM UTC.

iv) Location data found on this device dated November 22, 2023, placed the user of this device at or around SALAH's known residence in Phoenix, Arizona.

v)  Apple sent a text message to the user of this device on November 22, 2023, that the telephone number now associated with this Apple account is 279-226-5979. As noted above, 279-226-5979 is a number that SALAH provided to Trooper Esparza when he was stopped in Texas.

vi) Email address kotreafry@icloud.com received the following email from Apple: Your Apple ID information has been updated. Dear Aishah Hama almin, The following information for your Apple ID (k•••••@icloud.com) was updated on November 22, 2023.

Trusted Phone Number Added - Phone number ending in **79**[44] Your trusted devices are used to verify your identity when you make changes to your account, sign in to iCloud, or make iTunes or App Store purchases from a new device. For your security, a trusted device is removed from your account if you erase it, or if we are no longer to trust the device for any reason. You can re-verify your device or add a new one in the Security section of your Apple ID account page.

vii) Location and wireless network location data found on this device for dates at or around November 23, 2023, to SALAH's arrest on November 28, 2023, align with SALAH's known travel to Dallas, Texas, back to Phoenix, Arizona, and then on to El Cajon, California.

---

[43] During an FBI interview of SALAH's mother on December 16, 2023, she stated that telephone number 602-586-9402 is a telephone number maintained by SALAH.

[44] Telephone number 279-226-5979 ends in 79.

**G.   Information About Apple[45]**

149.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

150.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").   As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time.   iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.    iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.   For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.   iCloud Photo Library and My Photo Stream can be used to store and

---

[45] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

    d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

    e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

    f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

    g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

151.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

152.     Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

153.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and

the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

154.    Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

155.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service

("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

156.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

157.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

158.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

159.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

160.    Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

161.    Based on my training and experience, I know that criminals use cellular or mobile devices to communicate with each other through a messaging application that can be downloaded to a user's phone.  I also know that the users of these devices have the ability to store these conversations or other relevant content on their phone or in the cloud. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## II.      CONCLUSION

162.    Based on the foregoing, I respectfully request that this Court issues search warrants for the **YouTube Account**, the **Facebook Account,** and **Apple Account 1** and **Apple Account 2** particularly described in Attachments A-1 through A-3 that authorize seizure of the items described above and in Attachments B-1 through B-3, which are attached hereto and incorporated by reference herein.

163.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.  The government will execute this warrant by serving it on the providers.  Because the warrant will be served on the providers, who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution of the

requested warrant at any time in the day or night.

/s/
_____
Special Agent Jerid Hensley
Federal Bureau of Investigation

Affidavit submitted by email/pdf and
attested to me as true and accurate by
telephone consistent with Fed.R.Crim.P 4.1 and
41(d)(3) this  8th_  day of March 2024

_____
The Honorable Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

Approved as to form by:

__/s/ Angela L. Scott_____
Assistant United States Attorney

103

EXHIBIT A

1  PHILLIP A. TALBERT
   United States Attorney
2  ANGELA L. SCOTT
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

FILED

Feb 29, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

8              IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            CASE NO. 2:24-CR-0043 KJM

12                    Plaintiff,         18 U.S.C. 1038(a)(1)(A) – False Information and
                                         Hoax
13           v.

14  ZIMNAKO SALAH,

15                    Defendant.

16

17

18                      I N D I C T M E N T

19       The Grand Jury charges: T H A T

20                 ZIMNAKO SALAH,

21  defendant herein, on or about November 12, 2023, in Placer County, in the State and Eastern District of

22  California, did knowingly engage in conduct with the intent to convey false and misleading information,

23  under circumstances where such information might reasonably have been believed, and where such

24  information indicated that an activity was taking and would take place that would constitute a violation

25  of Chapter 40 of Title 18 of the United States Code, to wit:  SALAH knowingly affixed a backpack to a

26  toilet in the restroom of a church in Roseville, California with the intent to convey the

27  ///

28  ///

INDICTMENT                              1

false and misleading information that the backpack contained a bomb in violation of Title 18, United States Code, Section 844(i), all in violation of Title 18, United States Code, Section 1038(a)(1)(A).

A TRUE BILL.

/s/ Signature on file w/AUSA

_____
FOREPERSON

PHILLIP A. TALBERT
United States Attorney

No. __2:24-CR-0043 KJM__

---

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

SALAH, ZIMNAKO

---

## I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. 1038(a)(1)(A) – False Information and Hoax

---

*A true bill,*

### /s/ Signature on file w/AUSA

_____
*Foreman.*

*Filed in open court this* __29th__ *day*

*of* __February__ *, A.D. 20* __24__

_____ /s/ Jonathan Anderson _____
*Clerk.*

---

*Bail, $* _____    No process necessary

_____
U.S. Magistrate Judge

---

GPO 863 525

**<u>United States v. Zimnako SALAH</u>**
**Penalties for Indictment**

**<u>Defendants</u>**
**ZIMNAKO SALAH**        2:24-CR-0043 KJM


**<u>COUNT 1:</u>**            **ZIMNAKO SALAH**

VIOLATION:        18 U.S.C. § 1038 – False Information and Hoaxes

PENALTIES:        Maximum five-year term of imprisonment
                 Maximum $250,000 fine or both fine and imprisonment
                 Maximum three-year term of supervised release


SPECIAL ASSESSMENT: $100 (mandatory)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A-1**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following user IDs that are stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered in Mountain View, California:

YouTube channel URL youtube.com/channel/@zimnako1979 associated with display name "Mike AZ" and Google ID 65304195696.

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I.      Information to be disclosed By Google LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

a.      The contents of all communications associated with the account from account inception to the present, including stored or preserved copies of communications sent to and from the account, draft communications, the source and destination addresses associated with each communication, the date and time at which each communication was sent, and the size and length of each communication;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

e.      Any and all records associated with the YouTube's account registration, including the YouTube account's display name, IP logs, channel ID, account registration information, application information, and registration email;

f.      The contents of all media associated with the account on YouTube, whether active, deleted, or in draft, including: copies of videos and other media if uploaded to, saved to, shared by, or shared with the account; live streams; playlists; connected applications; associated URLs for each

record; creation and change history; privacy settings for each record; notifications; and all associated logs, including IP addresses, locations, timestamps, and device identifiers;

g.      Any and all records of the account's YouTube Watch History, including: accessed URLs and their associated duration, privacy settings, edits, comments, likes, chats, and other interactions, including associated URLs; search history; channels; subscriptions; subscribers, friends, and other contacts; IP addresses, change history, location information, and uploading account or identifier; and change history;

h.      Any and all instant messages, private messages, chats, emails, images, videos and SMS and or MMS messages sent or received by the account, to include sent and received data; Any and all records stored in the account's Google Drive made from the YouTube account;

i.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status,

The Provider is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

**II.      Information to be seized by the government**

1.   Information described above in Section I pertaining to the following matters that constitute fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes) involving Zimnako Salah:

a.   Communications sent, received, or accessed by Salah that relate to targeting religious institutions, bomb-making, hoaxes; or any individuals or groups who have committed or intend to commit violent acts;

b.   Any information, including records, documents, photographs and videos, pertaining to threatening to committing acts of violence, including bomb threats and hoax bomb threats;

c.   Any information, including records, documents, photographs and videos, pertaining to committing acts of violence;

d. Any information, including records, documents, photographs and videos, pertaining to possessing or manufacturing explosives, bombs or bomb-making equipment or supplies;

e. Family members and associates of Salah who were involved with or have had connections to terrorist organizations or terrorism, including photographs, address books, telephone numbers, and contacts or friends lists;

f. Financial activities of Salah, including information pertaining to account statements,  debit cards, or credit cards;

g. All records, documents, photographs, applications, items, keys, and materials demonstrating ownership, control, use, or possession of storage units or facilities, other safe deposit boxes, or other locations which may reasonably contain evidence related to violations of 18 U.S.C. § 247(a)(2) and 1038;

h. Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

i. Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

j. The identity of the person(s) who created or used the  account, including records that help reveal the whereabouts of such person(s); and

k. The identity of the person(s) who communicated with the account about matters relating to Salah's hoax activities, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review. Furthermore, the FBI may share any evidence gathered as a result of this search warrant with

1  appropriate members of the United States Intelligence Community and appropriate federal and state law

2  enforcement agencies.

1

**<u>ATTACHMENT A-2</u>**

2

**PROPERTY TO BE SEARCHED**

3          This warrant applies to information associated with the following Facebook account that is

4    stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company

5    headquartered in Menlo Park, California:

6          Facebook user ID 100067031421745

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B-2**

**Particular Things to be Seized**

**I.      Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A-2:

i.      All contact and personal identifying information, including:  full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

ii.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from account inception to the present;

iii.      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from account inception to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

iv.      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; followers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; unfollowed users; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

v.      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

vi.      All other records and contents of communications and messages made or received by the

user from account inception to the present, including all Messenger and Instagram Direct activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

    vii.        All "check ins" and other location information;

    viii.       All data associated with "hashtags" associated with user content;

    ix.        All "geotags" associated with posts and/or photos;

    x.        All IP logs, including all records of the IP addresses that logged into the account;

    xi.        All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

    xii.       All information about the Facebook pages that the account is or was a "fan" or "follower" of;

    xiii.       All past and present lists of friends created by the account;

    xiv.       All records of Facebook searches performed by the account inception to the present;

    xv.       All information about the user's access and use of Facebook Marketplace;

    xvi.       The types of service utilized by the user;

    xvii.       All "cookies" maintained by the account;

    xviii.      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

    xix.       All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

    xx.       All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

       Meta is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

**II.**    **Information to be seized by the government**

       Information described above in Section I pertaining to the following matters that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free

1  exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes) involving Zimnako SALAH:

2      a. Any information, including records, documents, photographs and videos, relevant to

3         SALAH's purchase of a motorcycle in or about August 2023 or September 2023;

4      b. Communications sent, received, or accessed by SALAH that relate to procuring items

5         that could be utilized in bomb-making or bomb hoaxes;

6      c. Any information, including records, documents, photographs and videos, pertaining to

7         items that could be utilized in bomb-making or bomb hoaxes;

8      d. Financial activities of SALAH related to the procurement of items that could be utilized

9         in bomb-making or bomb hoaxes, including any motorcycle purchases;

10     e. Evidence indicating how and when the Facebook account was accessed or used, to

11        determine the chronological and geographic context of account access, use, and events

12        relating to the crime under investigation and to the Facebook account owner;

13     f. Evidence indicating the Facebook account owner's state of mind as it relates to the crime

14        under investigation; and

15     g. The identity of the person(s) who created or used the user ID, including records that help

16        reveal the whereabouts of such person(s).

17       This warrant authorizes a review of electronically stored information, communications, other

18 records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and

19 instrumentalities described in this warrant.  The review of this electronic data may be conducted by any

20 government personnel assisting in the investigation, who may include, in addition to law enforcement

21 officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant

22 to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and

23 control of attorneys for the government and their support staff for their independent review.

24 Furthermore, the FBI may share any evidence gathered as a result of this search warrant with

25 appropriate members of the United States Intelligence Community and appropriate federal and state law

26 enforcement agencies.

27

28

**<u>ATTACHMENT A-3</u>**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following Apple IDs that are stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered in Cupertino, California:

Apple ID zimnako1979@gmail.com, DSID: 1522632377

Apple ID kotreafry@icloud.com, DSID: 20604610404

**ATTACHMENT B-3**

**Particular Things to be Seized**

**I.      Information to be disclosed by APPLE INC.**

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A-3:

a)      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b)      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c)      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at

which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d)      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e)      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f)      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g)      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h)      All records pertaining to the types of service used;

i)      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j)      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

## II.     Information to be seized by the government

Information described above in Section I pertaining to the following matters that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes) involving Zimnako SALAH:

a.      Communications sent, received, or accessed by SALAH that relate to targeting religious institutions, bomb-making, hoaxes, or that relate to any individuals or groups who have committed or intend to commit violent acts;

b.      Any information, including records, documents, photographs and videos, pertaining to threatening to committing acts of violence, including bomb threats and hoax bomb threats;

c.      Any information, including records, documents, photographs and videos, pertaining to committing acts of violence;

d.      Any information, including records, documents, photographs and videos, pertaining to possessing or manufacturing explosives, bombs or bomb-making equipment or supplies;

e.      Family members and associates of SALAH who were involved with or have had connections to terrorist organizations or terrorism, including photographs, address books, telephone numbers, and contacts or friends lists;

f.      Activities of SALAH, including journals, calendars, and diaries;

g.      Financial activities of SALAH, including account statements, ledgers, debit cards, credit cards, pay stubs, and use of any entities that can be used to transfer money;

h.      Travel, including any passports, travel receipts, tickets, reservations, and schedules;

i.      Bank accounts of SALAH, sources of funds, disposition or recipient of funds from these

accounts, bank records and statements, payment slips, checks, and any other financial records relating to SALAH;

     j.     Travel, including any passports, travel receipts, tickets, reservations, and schedules;

     k.     All records, documents, photographs, applications, items, keys, and materials demonstrating ownership, control, use, or possession of storage units or facilities, other safe deposit boxes, or other locations which may reasonably contain evidence related to violations of 18 U.S.C. §§ 247 and 1038;

     l.     Evidence indicating how and when the Apple account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Apple account owner;

     m.     Evidence indicating the Apple account owner's state of mind as it relates to the crime under investigation; and

     n.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review. Furthermore, the FBI may share any evidence gathered as a result of this search warrant with members of the United States Intelligence Community and appropriate federal, state, and local law enforcement agencies.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of )<br><br>Information associated with Facebook account )<br>100067031421745 that is stored at premises owned, )<br>maintained, controlled, or operated by Meta, Inc.. )<br>) | Case No.    2:24-sw-0244 CKD |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2 attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-2, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 22, 2024 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose residence, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     March 8, 2024 at 11:44 am          _____
                                                                                                    *Judge's signature*

City and state:     Sacramento, CA                              Carolyn K. Delaney, U.S. Magistrate Judge
                                                                                                *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

| _____ | _____ |
|---|---|
| Signature of Judge | Date |

**ATTACHMENT A-2**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California:

Facebook user ID 100067031421745

**ATTACHMENT B-2**

**Particular Things to be Seized**

**I.     Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A-2:

i.      All contact and personal identifying information, including:  full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

ii.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from account inception to the present;

iii.    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from account inception to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

iv.    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; followers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; unfollowed users; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

v.     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

vi.    All other records and contents of communications and messages made or received by the

user from account inception to the present, including all Messenger and Instagram Direct activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

vii.    All "check ins" and other location information;

viii.   All data associated with "hashtags" associated with user content;

ix.    All "geotags" associated with posts and/or photos;

x.    All IP logs, including all records of the IP addresses that logged into the account;

xi.    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

xii.    All information about the Facebook pages that the account is or was a "fan" or "follower" of;

xiii.   All past and present lists of friends created by the account;

xiv.   All records of Facebook searches performed by the account inception to the present;

xv.    All information about the user's access and use of Facebook Marketplace;

xvi.   The types of service utilized by the user;

xvii.  All "cookies" maintained by the account;

xviii.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

xix.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

xx.    All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

**II.    Information to be seized by the government**

Information described above in Section I pertaining to the following matters that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free

exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes) involving Zimnako SALAH:

    a. Any information, including records, documents, photographs and videos, relevant to SALAH's purchase of a motorcycle in or about August 2023 or September 2023;

    b. Communications sent, received, or accessed by SALAH that relate to procuring items that could be utilized in bomb-making or bomb hoaxes;

    c. Any information, including records, documents, photographs and videos, pertaining to items that could be utilized in bomb-making or bomb hoaxes;

    d. Financial activities of SALAH related to the procurement of items that could be utilized in bomb-making or bomb hoaxes, including any motorcycle purchases;

    e. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    f. Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

    g. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review. Furthermore, the FBI may share any evidence gathered as a result of this search warrant with appropriate members of the United States Intelligence Community and appropriate federal and state law enforcement agencies.